**Damon Q. SMITH, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CF–786.

District of Columbia Court of Appeals.

Argued March 16, 2011.

Decided July 21, 2011.

---

**2.** *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932).

Luke C. Platzer, with whom David A. Handzo and Adam Unikowsky, Washington, DC, were on the brief, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Elizabeth Trosman, John P. Mannarino, and Nihar R. Mohanty, Assistant United States Attorneys, were on the brief, for appellee.

Before OBERLY, Associate Judge, REID, Associate Judge, Retired,* and NEWMAN, Senior Judge.**

OBERLY, Associate Judge:

Appellant Damon Smith was found guilty after a jury trial of second-degree murder while armed, possession of a firearm during a crime of violence, carrying a pistol without a license, unlawful possession of ammunition, and possession of an unregistered firearm, in connection with the March 2004 shooting death of Bradley Gant.[1] Smith also was convicted of assault with a dangerous weapon and carrying a dangerous weapon for an earlier incident in which Smith allegedly stabbed Gant.[2] On appeal, Smith contends that the trial court erred by (1) precluding testimony about an exculpatory statement Gant made after the stabbing, (2) prohibiting him from impeaching the lead detective with information that she was the subject of an investigation for coaching witnesses in another case, and (3) refusing to let him argue to the jury that the testimony of the government's key witness had been coached. Smith argues that the errors (or

their cumulative impact) warrant a reversal of his conviction. We agree. Our review of this case leads us to conclude that the trial court made several errors during Smith's trial, the sum of which unfairly handicapped Smith's ability to defend himself, and we cannot say that the cumulative impact of those errors did not substantially sway the jury's verdict. Accordingly, we reverse and remand for a new trial.

## I. Facts

Gant was shot and killed at the Anacostia Metro station in Southeast Washington, D.C. on March 30, 2004. Carletta Douglas, a Metro bus operator, testified that she pulled into the Anacostia station at around noon that day and was preparing to go on break when she noticed two men arguing and getting "in each other's face[s]" right outside of her bus. According to Douglas, the two men fell into the back of her bus through the rear door as they continued to fight. When she saw that one of the men had a black gun that "[l]ooked like a police gun," she immediately began to run off the bus to get away from the fight. Douglas heard a gunshot when she got to the bus's bottom step and additional shots as she ran away from the bus. When Douglas looked back she saw "a guy laying [sic] on the ground" and another "guy running [away] pulling his pants up." She testified that the man lying on the ground was wearing a "black,

---

* Judge Reid was an Associate Judge of the court at the time of the argument. Judge Reid's status changed to Associate Judge, Retired, on April 7, 2011.

** Judge Kramer was assigned to this case at the time of argument. Following her retirement on May 1, 2011, Judge Newman was assigned to take her place.

1. Second-degree murder while armed is a violation of D.C.Code §§ 22–2103, –4502 (2004 Supp.); possession of a firearm during a crime of violence is a violation of D.C.Code

§ 22–4504(b) (2001); carrying a pistol without a license is a violation of D.C.Code § 22–4504(a)(1); unlawful possession of ammunition is a violation of D.C.Code § 7–2506.01(3) (2001); and possession of an unregistered firearm is a violation of D.C.Code § 7–2502.01.

2. Assault with a dangerous weapon is a violation of D.C.Code § 22–402, and carrying a dangerous weapon is a violation of D.C.Code § 22–4504(a).

puffy, North-face type coat" and the other man was wearing a thin black windbreaker and a dark-colored "[kufi]-type, Muslim-type cap." Another bus operator, Christine Goodson, testified that she heard the shots and saw the shooter running away from the scene wearing a "black cap . . . [or] do-rag . . ., blue jeans and black tennis shoes." Neither Goodson nor Douglas could identify the shooter, and Metropolitan Police Department ("MPD") Detective Kimberly Lawrence testified that she was present on the day of the shooting when Douglas was shown a photo array that included Smith's picture, and that Douglas was unable to make an identification. According to Detective Lawrence, Douglas said that the photos in the first and third spots in the array stood out more than the others, but that she was not sure. Smith's picture was in the fourth spot in the array.

The government's theory at trial was that Smith and Gant were involved in a feud that began when Gant's sister, Ronetta Mitchell, allowed Smith to leave his gun in her car on February 14, 2004. The gun disappeared, and Mitchell testified that when she ran into Smith at the home of a mutual friend in the first week of March and confirmed that the gun was missing, Smith became upset and began to swing at her with a broom handle. He hit her, and the pair spent a "couple of minutes tussling back and forth." Mitchell later told Gant that Smith had "attacked [her] . . . about that gun."

Laura Brown, who had known both Smith and Gant since elementary school, testified that she lived at the house where Smith and Mitchell had fought over the missing gun and that she had witnessed the altercation. Brown also was present "a couple of days or . . . a week later," when Gant and Smith separately showed up at the house, and Gant repeatedly asked to speak with Smith alone. Brown testified that the two men went outside, and after a few minutes she walked out and saw that Smith and Gant were "hav[ing] some words" and punching each other. Smith eventually ran away, at which point Brown noticed that Gant's shirt was wet with blood from a wound on his left hip. Brown told the jury that she went into the house to call an ambulance, and when she came back outside a few minutes later, Gant said: "[H]e cut me," meaning Smith. Smith's counsel objected on hearsay grounds to Gant's statement, but the trial court admitted it as an excited utterance. Brown also testified that she lied when she spoke to the emergency dispatchers. She told them that she "w[as] just walking past [Gant] . . . [and saw] him sitting on the steps." Brown also provided an incorrect address for the location of the fight, claimed not to know what had happened to Gant, did not mention Smith, and tried to minimize her role because she did not want "to be involved in anything."

Ahman Driver was a friend of Smith's who testified pursuant to a plea agreement related to weapon and drug charges against him that were pending at the time of Smith's trial. According to Driver, Smith told him in February or March of 2004 that Smith had "stabbed [Gant] in the butt" during a fight. Smith asked Driver to get him a gun because there was "a chance that [Gant] would try to get him." Driver obtained a black "9mm Highpoint" gun from his cousin, which he then provided to Smith. Driver testified that when he spoke with Smith three days after Gant was shot, Smith told him that Gant "walked up to him" at the bus stop "and started fighting," and that "in the midst of fighting, [Smith] pulled a gun and it wouldn't fire . . . so he removed the safety and started firing the gun." Smith reportedly told Driver that he burned the clothes he wore during the shooting, but that be-

cause he had dropped his hat at the scene, he was going to cut his hair. According to Driver, Smith asked him to trade the murder weapon for a different gun, and Driver returned the gun to his cousin in an attempt to trade it. Driver did not report any of this to the police.

Driver was arrested at his home on April 7, 2004, after police received a call about drug activity at that location. During a search of his home, the police found three handguns,[3] 10.7 grams of crack cocaine, and 331.7 grams of marijuana. Investigators questioned Driver about Gant's murder, and he provided a version of events that was substantially different from his trial testimony: He implicated Smith, but did not disclose that he had procured the gun used in the shooting, and he downplayed their friendship, denied that Smith had asked him to exchange the murder weapon after the shooting, and said only that he had overheard Smith talking about the details of the shooting to a mutual friend. Driver claimed that he had lied to the police initially, and he was impeached with the details of his plea agreement, which included that he was released from prison pending sentencing, and he went from facing anywhere from ten years to life in prison to facing a maximum of six years, with the added incentive of the government's offer to write a departure motion. That motion would allow Driver the "opportunity to persuade the [c]ourt that [he] should be sentenced to a lesser period of incarceration and/or fine than mandated by the Sentencing Guidelines." The government's writing of the departure motion was conditioned on Driver's providing "substantial assistance" to the Gant murder investigation.

In his defense, Smith tried to call MPD Detective McCloud,[4] who responded to Brown's 911 call after the stabbing and questioned Gant before Gant was taken away in an ambulance. According to Smith's counsel's proffer, Gant told Detective McCloud "that he was approached by six or seven black men" and that he "ha[d] no idea who stabbed him." In response to the prosecution's hearsay objection, Smith's counsel argued that she was offering Detective McCloud's testimony to impeach Brown. The trial court held that Smith could not "use what Bradley Gant told [Detective McCloud] to impeach [Brown] because it's not [Brown's] statement you are impeaching.... What impeaches [Brown] is if she says two different things or if Bradley Gant says two different things. You can't use two different people saying two different things to impeach one another." Smith's counsel later faxed to the trial court additional arguments for why Gant's statement to Detective McCloud was admissible, including that it was an exception to the hearsay rule as an excited utterance and a present sense impression. The trial court dispensed quickly with the excited utterance argument: "I don't think it's excited utterance. To me it's testimonial, you are telling the police who stabbed you. You're certainly not telling them so they won't get them. That's exactly why you are telling them, so they can be prosecuted." The trial court also rejected Smith's argument that the statement was a present sense impression: "I don't think you are offering this as [a] present sense impression. You are offering this that your man didn't do it. It was six or seven other black men that did it.... [You] are trying to get it in for the truth of the matter asserted therein." Because the trial court refused to let

---

3. The murder weapon was not among the guns found in Driver's home.

4. Detective McCloud's first name does not appear in the trial record.

Smith ask Detective McCloud about Gant's statement to her, the jury never heard that Gant said he "ha[d] no idea who stabbed him."

Smith called MPD Detective Milagros Morales, the lead detective on the murder investigation. Pursuant to his plea agreement, Driver was required to speak with Detective Morales weekly in the months leading up to his grand jury testimony. Prior to trial, the prosecutor provided Smith's attorney with a letter advising that there had been "allegations that Detective[ ] Morales ... coached witnesses in [the 'Club U' homicide] case[5] to be untruthful," that she had "been suspended by the Metropolitan Police Department pending an Internal Affairs investigation," and that the "allegations [were] being investigated by the Department of Justice." Based upon the letter, Smith's counsel wanted to question Detective Morales about the Club U case and try to show that she also had coached Driver to include details in his story that implicated Smith. Smith's attorney also argued that she was at least entitled to ask Detective Morales about an unspecified investigation, which she believed would show Detective Morales's bias in favor of the prosecution because, by providing helpful testimony, Detective Morales would curry the government's favor in the investigation. After extensive argument, the trial court prohibited Smith's counsel from mentioning the Club U investigation in any way because she did not have actual evidence that Detective Morales had coached witnesses, and because it appeared to the trial court that Smith's only reason for calling Detective Morales was "to parade her as a dirty cop."

■ The jury found Smith guilty of all charges in March 2006, and he was sentenced to 174 months in prison. Our review of the record convinces us that the trial court erred both with respect to the testimony surrounding Gant's stabbing and by refusing to allow Smith to impeach Detective Morales with the Club U investigation. We need not decide whether the harm occasioned by each of these errors individually warrants reversal because, taken together, their cumulative impact "so impair[ed] [Smith's] right to a fair trial" that we are compelled to reverse and remand for a new trial. *Foreman v. United States*, 792 A.2d 1043, 1058 (D.C.2002).

## II. Discussion

In the words of the trial court, this was a case "where the Government basically ... doesn't have much of nothing." No eyewitness identified Smith as Gant's shooter, and the evidence connecting him directly to the murder was supplied by one witness: Ahman Driver, an admitted liar with a plea deal. To try to prove its case, the government relied heavily on its theory that the stabbing was Smith's motive for the shooting and presented Brown's testimony to implicate Smith in the stabbing. Over Smith's objection, the trial court admitted as an excited utterance Brown's testimony that Gant identified Smith as the stabber; however, there was no indication in the record that Gant was actually excited when he made the statement.

Smith tried to counter the government's motive evidence by calling Detective McCloud to testify that Gant said he "had no idea" who had stabbed him. Smith

5. Detective Morales was subsequently indicted for her involvement in the investigation of a February 2005 murder at Club U in Northwest Washington, D.C., but was ultimately acquitted of all charges. *See* Carol D. Leonnig, *Jury Acquits Two Detectives Accused of Swaying Witnesses*, Aug. 31, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/08/30/AR2007083001468.html.

argued that Detective McCloud's testimony was admissible as a hearsay exception or as impeachment evidence, but both arguments were erroneously rebuffed by the trial court. First, the trial court refused to admit Detective McCloud's testimony as independent, substantive evidence because the court conflated the rule in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), with the rules for admitting hearsay exceptions. Second, the trial court overlooked the fact that an out-of-court declarant's statement is subject to impeachment. Because of these errors, Smith's efforts to refute the government's motive evidence were hampered, while the government, in contrast, benefitted by being allowed to present Gant's statement to Brown with a dearth of foundational evidence for the "excited utterance" exception.

Finally, Smith also was improperly precluded from attempting to undermine Driver's testimony by impeaching Detective Morales with the Club U investigation. Driver's testimony was the most important part of the government's case, and the existence of the Club U investigation would have been a powerful reason for the jury to question Driver's story. This error by the trial court stopped Smith from presenting that seed of doubt to the jury, both in testimony and at closing argument.

In light of the errors that were made at Smith's trial and their impact on Smith's defense, we simply cannot conclude that "when all is said and done," the jury's verdict "was not substantially swayed by the error[s]" and that Smith's substantial rights were unaffected. *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

## A. The Trial Court Erred in Ruling on the Hearsay Objections

 "Hearsay evidence, the in-court testimony of an out-of-court statement offered to prove the truth of the matter asserted, is generally not admissible at trial." *Laumer v. United States*, 409 A.2d 190, 194 (D.C.1979) (en banc). Hearsay "will be admissible[,] [however,] if it falls under an exception." *Dutch v. United States*, 997 A.2d 685, 688 (D.C.2010). "We review a trial court's decision to admit hearsay evidence for abuse of discretion; however, the determination of whether a statement falls under an exception to the hearsay rule is a legal conclusion, which we review *de novo*." *Id.; see also Melendez v. United States*, 26 A.3d 234, 245 (D.C.2011).

 "The accepted premise of the excited utterance exception [is] that a person making an exclamation or a statement while under the influence of the excitement or shock caused by witnessing an extraordinary event[ ] is unlikely to fabricate an untruth, but, on the contrary, has a tendency to disclose what is actually on his mind [because] [t]he mental stress and nervous strain preclude deliberation and bar reflection." *Simmons v. United States*, 945 A.2d 1183, 1190 (D.C.2008) (third and fourth alterations in original) (quotation marks omitted). To be admissible, a purported excited utterance must meet three elements: " '(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.' " *Melendez*, 26 A.3d at 245 (quoting *Odemns v. United States*, 901 A.2d 770, 776 (D.C.2006)). "While [excited] utterances have long been recognized ... as exceptions to the hearsay rule, the acceptance of a particular statement as [an excited] utterance depends upon the facts peculiar to each

case." *(Andre) Price v. United States*, 545 A.2d 1219, 1225–26 (D.C.1988) (quotation marks omitted). The key factor is "whether the circumstances reasonably justify the conclusion that the remarks' were not made under the impetus of reflection." *Young v. United States*, 391 A.2d 248, 250 (D.C.1978).

■ ■ With respect to satisfying the first prong of the excited utterance test, there is no question that a stabbing can be a sufficiently serious occurrence, *see, e.g.*, *Reyes–Contreras v. United States*, 719 A.2d 503, 506 (D.C.1998) (physical attack was "[c]learly ... a startling event" (quotation marks omitted)); *Young*, 391 A.2d at 250–51 (declarant's statements, made after he was stabbed, admissible as excited utterances), but the analysis cannot end there. The test requires that the serious or startling event "cause[ ] a state of nervous excitement and shock in the declarant," *Smith v. United States*, 666 A.2d 1216, 1222 (D.C.1995), because the exception is intended to apply only "to situations in which the declarant [is] *so excited* by the precipitating event that he or she [is] still under the spell of its effect." *Odemns*, 901 A.2d at 777 (quotation marks omitted) (emphasis added).

### 1. The Trial Court May Have Erred by Admitting Laura Brown's Testimony that Gant Said Smith "Cut" Him[6]

The trial court admitted Gant's statement that Smith cut him (through Laura

Brown's testimony) as an excited utterance based on, *inter alia*, findings that the stabbing was "an excitable incident" and that the statement was uttered "a short time after the incident happened." Missing from both the record and the trial court's analysis, however, is any evidence describing Gant's actual demeanor in the minutes after he was stabbed. A "showing sufficient to satisfy the first element [of the excited utterance test] cannot be made when there is no evidence that the declarant suffered mental disturbance or physical shock as a result of the event." *Alston v. United States*, 462 A.2d 1122, 1127 (D.C. 1983); *see also Walker v. United States*, 630 A.2d 658, 666 (D.C.1993) (where there was nothing to demonstrate that "the declarant[ ] was distraught, in shock, or in a state of nervous excitement at the time the statement was uttered," the "trial court had no basis ... to find that the first element had been satisfied"). Without the government's having put forth any evidence to demonstrate that Gant was sufficiently "excited," there would appear to be no support for the trial court's decision to admit Brown's testimony about what he told her. However, given our disposition of issues actually raised by Smith, we need not decide this issue.

### 2. It Was Error to Deprive Smith of the Chance to Present Detective McCloud's Testimony

■ ■ There also was a dearth of evidence in the record about Gant's level of

---

6. Smith did not raise this issue on appeal; he challenges only the trial court's exclusion of the testimony he sought to elicit from Detective McCloud. Because the same declarant— Gant—spoke both to Brown and Detective McCloud, however, we cannot logically analyze the trial court's conclusion that Gant's statement to Detective McCloud was not admissible as an excited utterance without also considering the admissibility of Gant's statement to Brown. *Cf. March v. United States*,

362 A.2d 691, 697 n. 7 (D.C.1976) (" 'In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings.' " (quoting *Silber v. United States*, 370 U.S. 717, 718, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962))).

excitement when he told Detective McCloud that he did not know who stabbed him. To the extent any such evidence existed, Smith was deprived of the chance to present it because of two separate errors on the part of the trial court.

▇▇ First, the court's holding that Gant's statement to Detective McCloud was inadmissible as an excited utterance overlooks *Crawford's* impact on hearsay analysis. The Supreme Court held in *Crawford* that " 'the Confrontation Clause bars the government from introducing testimonial statements at trial against a criminal defendant without calling the declarant to testify in person, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.' " *Long v. United States,* 940 A.2d 87, 93 (D.C.2007) (quoting *Thomas v. United States,* 914 A.2d 1, 11 (D.C. 2006)). "[A]t a minimum," the definition of "testimonial" includes police interrogations, *Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1153, 179 L.Ed.2d 93 (2011) (quotation marks omitted), where the " 'primary purpose ... is to establish or prove past events potentially relevant to later criminal prosecution.' " *Id.* at 1154 (quoting *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)). Here, the trial court held that Gant's statement was not an excited utterance because the court believed that it was testimonial: "I don't think it's excited utterance. To me it's testimonial, you are telling the police who stabbed you." Even

assuming that Gant's statement to Detective McCloud was testimonial, *Crawford* would not apply because Smith was the party seeking to introduce the statement. The guarantee of the Confrontation Clause, from which *Crawford* stems, is that " '[i]n all criminal prosecutions, *the accused* shall enjoy the right to be confronted with the witnesses against him.' " *Crawford,* 541 U.S. at 38, 124 S.Ct. 1354 (alteration in original) (emphasis added) (quoting U.S. CONST. amend. VI). In this case, because "the accused" was the party seeking to introduce Gant's statement, the trial court erred by treating the fact that it was made to a police detective as outcome-determinative. Whether Gant's statement to Detective McCloud was testimonial under *Crawford* was irrelevant, and the trial court should have allowed her to take the stand and testify about her interaction with Gant in sufficient detail for the court to analyze meaningfully the excited-utterance factors listed above.[7]

▇▇▇ The trial court's second error with respect to Detective McCloud's testimony occurred after Smith argued that Gant's statement to her was admissible as a present sense impression, which is a "statement[ ] describing or explaining events which the declarant is observing at the time he or she makes the declaration or immediately thereafter." *Hallums v. United States,* 841 A.2d 1270, 1276 (D.C. 2004). The trial court's holding, that the statement was not a present sense impres-

---

7. With respect to the second prong of the excited-utterance test, we note that the trial court allowed the prosecution a twenty-minute window in which Gant's statement to Brown could have been made before the court would have had concerns about reliability: "[It has] already [been] established [as] an excitable incident.... Maybe you could ask her about the time or what was said. And if it's, you know, within [twenty] minutes or so, I guess you wouldn't have that much time to contemplate about who did it." When Brown testified that the statement came "just a few minutes" after she called the ambulance, the trial court permitted her to testify about Gant's statement that Smith "cut" him. Whether or not twenty minutes was too much or too little time under the second prong of the excited-utterance test, we agree with Smith that he should have been afforded a similar opportunity to establish the timing of Gant's statement to Detective McCloud.

sion because Smith was "trying to get it in for the truth of the matter asserted therein," was error. The definition of hearsay is "an out-of-court statement *offered to prove the truth of the matter asserted,*" *Dutch,* 997 A.2d at 688 (emphasis added), so understandably Smith's attorney was trying "to get it in" for its truth by arguing that it fit within the present sense impression exception. Furthermore, when Smith's counsel argued that the statement fit within this exception because "[Gant was] making the statement immediately after the event ha[d] happened to him," the trial court cut off her argument by holding: "It's testimonial. Denied. Let's move forward." As already explained, whether or not the statement was testimonial was irrelevant, and the trial court should have attempted to determine whether it was admissible as a present sense impression.

## B. The Trial Court Erred by Refusing to Let Smith Impeach Gant's Earlier Statement

 Smith argues that Detective McCloud's testimony was admissible to impeach Gant's earlier statement to Laura Brown that Smith "cut" him. Once admitted, Gant's statement became open to impeachment by Smith, and the trial court should have admitted Detective McCloud's testimony for that purpose.

 " 'An impeachment witness, by definition, includes one who will testify that the adversary's witness has made a prior inconsistent statement, and is therefore less worthy of belief than if she had testified consistently.' " *Gamble v. United States,* 901 A.2d 159, 171–72 (D.C.2006) (quoting *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 537 (D.C.1991)). If Gant had been alive to testify at trial that Smith stabbed him, Detective McCloud's testimony certainly

would have been admissible to impeach him. *See, e.g., Gamble,* 901 A.2d at 171–72. Gant did not testify, of course, but once the trial court admitted his earlier statement to Brown, Gant became "in essence, [a] witness[ ], and should [have] be[en] treated as such for credibility purposes." *Watkins v. United States,* 846 A.2d 293, 298 (D.C.2004). According to Federal Rule of Evidence 806, an out-of-court declarant's " 'credibility should in fairness be subject to impeachment and support as though he had in fact testified.' " *Id.* (quoting Fed.R.Evid. 806 Advisory Committee notes); *see also* Fed.R.Evid. 806 (an out-of-court declarant's credibility is open to attack "by any evidence which would be admissible . . . if declarant had testified as a witness"). "While this jurisdiction has not adopted the Federal Rules of Evidence, this court will look to those rules for guidance," *Goon v. Gee Kung Tong, Inc.,* 544 A.2d 277, 280 n. 9 (D.C.1988), and we hold that the trial court erred by refusing to permit Smith to use Detective McCloud's testimony to impeach Gant.

## C. The Trial Court Should Have Allowed Smith to Impeach Detective Morales with the Club U Investigation

 The prosecution did not call Detective Morales to testify, but Smith chose to call her, and there was extensive argument at trial about his motivation for doing so. The trial court ultimately determined that Smith's only purpose in calling Detective Morales was "to parade her as a dirty cop" and refused to let Smith question her about the ongoing witness-coaching investigation arising out of the Club U matter. Smith argues on appeal that he should have been allowed to introduce the Club U investigation as exculpatory evidence of Morales's prior bad act, under *Winfield v. United States,* 676 A.2d 1 (D.C.

1996) (en banc), and also as impeachment evidence. We reject Smith's argument that the Club U investigation was admissible under *Winfield,* because that case and the others on which Smith relies require *evidence* of a third party's prior misconduct. *See, e.g., Battle v. United States,* 754 A.2d 312, 315 (D.C.2000) (appellant offered proof of an earlier shooting by an unknown assailant). Smith's counsel was armed with nothing more than a letter from the prosecutor indicating that there was a pending investigation into whether Detective Morales had coached witnesses in the Club U case, which is not evidence that the detective had in fact coached witnesses.[8]

 Detective Morales's role in the Club U investigation was admissible, however, for impeachment purposes, and the trial court erroneously exercised its discretion by precluding Smith from using it to expose her potential credibility problems and bias in favor of the prosecution. *See Brown v. United States,* 683 A.2d 118, 124 (D.C.1996). "The credibility of a witness may be attacked by any party, including the party calling the witness," D.C.Code § 14–102(a) (2001); *see also Sparks v. United States,* 755 A.2d 394, 401 (D.C. 2000), and " 'bias is always a proper subject of cross-examination.' " *Brown,* 683 A.2d at 124 (quoting *Jones v. United States,* 516 A.2d 513, 517 (D.C.1986)). A trial court's "refusal to allow questioning about facts indicative of [a witness's] bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension...." *Cunningham v. United States,* 974 A.2d 240, 245 (D.C.2009); *see also Martinez v. United States,* 982 A.2d 789, 794 (D.C.2009) ("The right of an accused to present a complete defense, ... rooted directly in the Due Process Clause ..., includes the guarantee of a full and fair opportunity to show that [adverse] witnesses are biased." (quotation marks omitted)). "On the other hand, ... [t]he trial court may restrict [questioning] within reasonable limits to avoid such problems as harassment, prejudice, confusion of the issues, ... or interrogation that is repetitive or only marginally relevant." *Id.* (quotation marks omitted).

 A party must first lay "a proper foundation ... before [pursuing] a line of questioning suggesting that a witness is biased." *Brown,* 683 A.2d at 124 (quotation marks omitted). " '[T]o survive objection, the questioner must proffer some facts which support a genuine belief that the witness is biased in the manner asserted. In addition, the attorney must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias.' " *Id.* at 124–25 (quoting *Jones,* 516 A.2d at 517). " 'In the absence of such a factual foundation, the questioner must articulate a well reasoned suspicion rather than an improbable flight of fancy to support the proposed cross-examination.' " *Brown,* 683 A.2d at 125 (quoting *Scull v. United States,* 564 A.2d 1161, 1164 (D.C.1989)). Our case law is "fairly lenient in describing how th[e] requirement [of a factual foundation] may be met.... [T]he questioner must support any proposal for cross-examination with a credible statement describing the suspected cause of the bias in the witness, supported by plausible factual allegations or itself plausible within the framework of facts that neither party has contested." *Brown,* 683 A.2d at 125 (alterations in original) (quotation marks omitted). We have held that a "defendant's proffer is sufficient, for example, if

***

**8.** Smith's trial counsel's failure to marshal *Winfield* evidence is the subject of his motion to vacate pursuant to D.C.Code § 23–110 (2001), which has been pending before the trial court since April 18, 2008.

'counsel has information from her own client, which she does not know to be false and which is not inherently incredible.' " *Id.* (quoting *Scull,* 564 A.2d at 1164).

To lay the proper foundation, Smith proffered information (provided by the prosecutor) that Detective Morales was being investigated for coaching witnesses in the Club U case. Based on that information, Smith's counsel asserted a genuine belief that "even if [Detective Morales] had suggested anything to [Driver] . . ., she's not going to admit to it right now because she's got a monkey on her back. She's not like a regular detective who doesn't have any bias, doesn't have anything [hanging] over [her] head, and can come in here and say . . . [']Yes, I strong armed him. I know his story was different. I wasn't happy with that. But by the time I had talked to him several times he gave me the version I wanted.['] Another detective could possibly say that[,] [one] [w]ho is not being investigated, is not on suspension. If [Detective Morales] did those things she cannot admit to it because she knows that if she admits to it here, even if it were true, she is going to be in a whole lot of trouble. She has to testify in a way that's consistent with helping the government. And helping the government means [she's] got to say that Driver was telling the truth. . . . [She's] got to say that even though he added to the story [she] had nothing to do with it. . . . Our position is that it's been offered to curry favor with the government. She can't say otherwise because she has this monkey on her back."

■ That Detective Morales was under investigation for coaching witnesses was an undisputed fact, and it was one we believe Smith's counsel supported with a genuine belief (1) that Detective Morales's credibility could be questioned when she denied coaching Driver, and (2) that she was biased in favor of the government.

We have held that the existence of an investigation—and the witness's knowledge of it—"would provide a motive for [the witness] to curry favor with the government." *Cunningham,* 974 A.2d at 241; *cf. Blunt v. United States,* 863 A.2d 828, 835 (D.C.2004) (where testifying witness was aware that there were pending charges against him in Maryland that the "Maryland prosecutor could revive[,] [there was] a sufficient basis to require the court to permit at least some questioning about them"); *Scull,* 564 A.2d at 1165 (holding that "the witness'[s] subjective belief in the possibility of prosecution is central," and "[t]o the extent that the proposed cross-examination might [have shown] or uncover[ed] a bias or motivation underlying [the witness's] testimony, it was relevant and admissible"). Given that our "lenient" case law requires only a proffer of "some facts which support a genuine belief that the witness is biased in the manner asserted," or a "well-reasoned suspicion . . . to support the proposed [questioning]," *Brown,* 683 A.2d at 124–25, the Club U investigation—and the fact that it involved allegations of witness-coaching—should not have been precluded as impeachment evidence. Smith's counsel asked Detective Morales repeatedly if she had suggested answers or provided information to Driver during the course of their interactions, and Detective Morales denied doing so. Smith's counsel argued that because of the Club U investigation, Detective Morales had both the desire to curry favor with the government by offering helpful testimony and also the motivation to deny coaching Driver, because regardless of whether the allegations of past witness-coaching were true, an admission that she influenced Driver's story would likely interfere with her chances of emerging unscathed from the pending Club U investigation. Accordingly, when Smith's counsel asked her if she had coached Driver, there existed a well-reasoned suspicion

that Detective Morales would answer "no," even if that was not the case. Smith therefore was entitled to impeach her credibility with both the fact and the subject matter of the investigation. Although we recognize that a trial court is given great leeway to exclude evidence if the court believes it will be unduly prejudicial, *see Riddick v. United States*, 995 A.2d 212, 216 (D.C.2010), here we conclude that the trial court erred in holding that the risk of prejudice outweighed the probative value of the evidence. Moreover, any risk of prejudice in revealing the substance of the Club U investigation could have been ameliorated by an instruction to the jury on the purposes and uses of impeachment evidence. *See Scull*, 564 A.2d at 1165 & n. 7 ("Any potentiality of confusion to the jury may be eliminated by proper instructions," which we "presume that the jury understands and follows.").

■ Finally, we reject the government's claim that Smith called Detective Morales as a subterfuge. "Impeachment of one's own witness cannot be permitted where employed as a mere subterfuge to present to the jury evidence not otherwise admissible," *United States v. Kane*, 944 F.2d 1406, 1411 (7th Cir.1991), and "[t]he test is whether the [questioning party] exhibited bad faith by calling a witness sure to be unhelpful to its case." *Id.* at 1412. Smith's defense hinged on the jury's rejecting Driver's testimony, which Smith's counsel made clear during her closing argument: "The government's case rises and falls on Ahman Driver. A man who took

this stand and admitted to you that on several times he lied. And yet, the government wants you to credit that man's story as the reason to convict Damon Smith." By questioning Detective Morales, Smith highlighted and confirmed that Driver's story to the police changed over time to include claims that Smith asked Driver to get him the murder weapon, later returned it, burned his clothes, confessed to dropping his hat, and admitted to the murder. We agree with Smith that calling Detective Morales helped him "highlight[ ], with testimony from the government's own investigating detective, the fact that Driver had lied to investigators and ... implicated Smith only once there was a plea deal and sentencing reduction in it for him." Because Detective Morales provided information that was helpful to Smith's defense, we are unwilling to hold that Smith's counsel exhibited bad faith in calling her to testify. *See Kane*, 944 F.2d at 1411–12.[9]

Smith should have been permitted to ask Detective Morales about the Club U investigation to expose to the jury her potential bias. By wrongly depriving Smith of the ability to challenge Detective Morales's credibility, the trial court erroneously exercised its discretion. *See generally Johnson v. United States*, 398 A.2d 354, 361–67 (D.C.1979).

### D. The Trial Court's Errors Substantially Influenced the Jury's Verdict

■ In assessing the harm done to Smith's defense by the trial court's errors,

---

9. Smith's final claim is that the trial court erred by prohibiting him from arguing to the jury that Detective Morales had coached Driver's testimony. During closing argument, counsel "may not ... rely on evidence that has not been presented. Counsel is entitled to make reasonable comments on the evidence, and to argue all reasonable inferences from the evidence adduced at trial." *Clayborne v. United States*, 751 A.2d 956, 969

(D.C.2000) (quotation marks and citations omitted). The trial court held that it "[was] not a reasonable inference" that Detective Morales was "the one that was the impetus behind [Driver] changing his story." Had the trial court properly allowed Smith's counsel to examine Detective Morales about the Club U investigation, however, Smith would have been able to make the coaching argument in closing.

we apply the familiar *Kotteakos* standard,[10] which teaches that "[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." 328 U.S. at 764–65, 66 S.Ct. 1239.

▬ "The standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the jury's verdict." *Foreman,* 792 A.2d at 1058; *see also (Milton) Price v. United States,* 697 A.2d 808, 817 (D.C.1997). "[I]ndividual errors, not warranting reversal, may when combined so impair the right to a fair trial" that reversal is required. *Foreman,* 792 A.2d at 1058. In deciding whether the cumulative effect of the errors "may have substantially influenced the jury's verdict requiring reversal of [Smith's] convictions, we evaluate the significance of the alleged errors and their combined effect against the strength of the prosecution's case." *Id.*

It bears repeating that the trial court viewed this as a case "where the Government basically ... doesn't have much of nothing," and we agree. No one identified Smith as the shooter, and nothing connected him physically to the murder scene except for a hat found at the scene containing DNA from Smith and four other unidentified people. Both Christine Goodson and Carletta Douglas testified, however, that they saw the shooter run away still wearing a hat or other head covering. The only other direct connection between Smith and Gant's murder was the testimony of Ahman Driver, a man who admitted lying to police about his involvement with the murder weapon, who changed his story over time, and who received a favorable plea deal in exchange for, *inter alia,* his cooperation in the murder investigation and his testimony at Smith's trial.

The government therefore relied heavily on Gant's stabbing as motive for his murder, which is clear from the prosecutor's opening and closing statements. He first described how Gant and Smith ran into each other at the Anacostia Metro station on the day of the murder, and he explained that "this was not a happy reunion because just a few weeks before ... Damon Smith ... had been in a fight with Bradley Gant's sister. When Bradley Gant learned about that, he got in a fight with the defendant.... And in that fight the defendant stabbed Bradley Gant to his left hip. So this was not a friendly, hey, nice to see you, what's going on reunion." During closing argument, the prosecutor walked the jury through the motive evidence, describing the fight between Gant and Smith and the events leading up to it, referring to "[t]he stabbing [as] further evidence of the defendant's motive in this case."

Smith needed to refute the government's theory, but the trial court's errors hampered his defense. Although Detec-

---

**10.** Smith argues that our review of the trial court's error with respect to impeaching Detective Morales should be under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), for constitutional error. Because the trial court's decision was not harmless under the less-stringent *Kotteakos* standard, it is unnecessary for us to consider whether the trial court's error was of constitutional magnitude and thus reviewable under *Chapman.*

tive McCloud's testimony may have been admissible as an excited utterance to show that Gant denied knowing who stabbed him and reported seeing six or seven unknown men at the scene of the stabbing, the trial court erroneously deprived Smith of the chance to demonstrate its admissibility. Detective McCloud's testimony also may have been admissible as a present sense impression, but the trial court's failure to consider the very purpose of hearsay exceptions (testimony admitted under them is indeed offered for its truth) prevented Smith from establishing that it fit within that exception. The end result of the trial court's errors concerning the applicability of hearsay exceptions is that the government was allowed to present evidence to the jury showing that Gant had identified Smith as his assailant, while Smith was precluded from demonstrating that the same victim had said he did not know who had stabbed him. That the government was allowed to put on its evidence with a paucity of foundational support while Smith was erroneously deprived of the ability to lay a proper foundation for similar evidence strikes us as an improper result, and we cannot gainsay that it may

have substantially influenced the jury's verdict with respect to the charges stemming from Gant's death, especially given the importance that the government placed on Smith's alleged motive for the murder.[11] Furthermore, there is no question that the jury's verdict was substantially influenced by these errors with respect to the charges that arose from Gant's stabbing (assault with a dangerous weapon and carrying a dangerous weapon). The main evidence connecting Smith to the stabbing was Brown's testimony, but she told police and ambulance dispatchers that she had no idea who had stabbed Gant, a version of events consistent with Gant's statement to Detective McCloud that he did not know who stabbed him, and completely different from her trial testimony (which pinned the blame on Smith).

██ The trial court also erred in overlooking the fact that the admission of Brown's testimony that Gant said Smith cut him rendered Detective McCloud's testimony admissible to impeach Gant's earlier statement.[12] Knowledge that Gant himself had provided conflicting stories about who stabbed him might well have shaken

---

11. It is worth noting that there appears to have been some confusion during the jury's deliberations on the issue of motive. The jury sent a note asking: "With respect to Counts 6 and 7, [which arose out of Gant's stabbing,] is it correct that the jury must be unanimous with respect to the specific incident that gives rise to the actual violation? Put differently, and speaking purely hypothetically, can some of the jurors find that the incident at Anacostia [i.e. Gant's shooting] gave rise to violations of Count 6 and 7, while other jurors [find] that the stabbing incident outside of Ms. Brown's apartment gave rise to the violations[,] or must the jury be unanimous with respect to at least one of these incidents in order to find guilt?" The trial court assumed that the jury did not "understand the sequence of events" and responded to the question by instructing the jury as to the dates for each incident.

12. The government argues that this claim should be reviewed for plain error because Smith's trial counsel focused solely on using Detective McCloud's testimony to impeach Laura Brown (and not Gant). Because we are reviewing the cumulative impact of the trial court's multiple mistakes in this case, the standard is whether, taken together, the errors "may have substantially influenced the jury's verdict." (Milton) Price, 697 A.2d at 817. It is therefore unnecessary to consider whether the claim would survive under plain-error review. See id. at 814, 816–17 (acknowledging the government's argument that one of the trial court's errors was subject to plain-error review, but instead applying the cumulative-impact standard).

the jury's confidence in Smith's involvement in the stabbing, the murder, or both.

Finally, the trial court erred in prohibiting Smith from impeaching Detective Morales with the Club U investigation, which meant that Smith could not undermine her credibility when she denied coaching Driver, and thus could not make his most powerful argument against Driver's version of events. Driver and Detective Morales both denied that any witness-coaching had taken place, and Smith should have been allowed to demonstrate that Detective Morales's denial was likely influenced by the Club U investigation. It is precisely because Driver's testimony was so vital to the government's weak case (providing, *inter alia,* the only link between Smith and the murder weapon, in addition to Smith's alleged confession) that this error was so harmful to Smith's defense. In addition to demonstrating to the jury that the details of Driver's testimony changed over time in a way that was extremely helpful to the government's case, Smith should have been able to show, by impeaching Detective Morales, that if she had coached Driver, the detective would not admit to it because of the Club U investigation.

### III. Conclusion

In reviewing the entire record and evaluating the errors that were made, we cannot be confident that Smith received a fair trial. Accordingly, we reverse and remand for a new trial.

*So ordered.*[13]

---

**13.** The court wishes to thank Smith's named attorneys, as well as their law firm, Jenner & Block LLP, for their representation of Smith *pro bono publico* in this case.