**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kenneth KANE, Defendant–Appellant.**

**No. 90–3318.**

United States Court of Appeals, Seventh Circuit.

Argued June 13, 1991.

Decided Oct. 2, 1991.

Andrew B. Baker, Jr., Asst. U.S. Atty., argued, Dyer, Ind., for plaintiff-appellee.

Jeffrey Urdangen, argued, Chicago, Ill., for defendant-appellant.

Before CUMMINGS and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Steven Molnar and Tim Martin found a way to exploit the eagerness with which some banks approve car loans. In 1982, while Martin was employed at the First Bank of Whiting, he told his friend Molnar that it would be easy to obtain loan checks by calling in to apply for car loans on fictitious cars. Various banks approve auto loans, sometimes in as little as 24

hours, after checking the applicant's credit and employment. Molnar and Martin recruited impostors to apply for loans at First Bank of Whiting. The impostor would claim to be a person with a favorable credit history whose name Martin had obtained from a credit bureau. Once the bank issued the loan check, the impostor would pick it up from the bank, cash it, and distribute the proceeds amongst the schemers.

Martin predictably lost his job at First Bank of Whiting when the bank discovered that he was authorizing fraudulent auto loans, and the pair turned to victimizing other banks. Martin directed Molnar to contact defendant Kenneth Kane, who operated a used car business called J & K Kars in Highland, Indiana. Subsequently when individuals hired by Martin and Molnar posed as applicants, Kane pretended to be the seller of the car and supplied to the bank a description of the car and a vehicle identification number ("VIN"). He also represented that he had title to the car and therefore that the bank would be able to assert a lien against the title at the time the loan check was cashed. Kane participated in making applications for five loans at three different banks in the spring and summer of 1984. In some cases, he phoned in the application himself as the dealer applying for a loan on behalf of a car buyer. He and his wife cashed some of the loan checks, which named both the car dealer and the purported buyer as payees. Kane admitted that he received $500 from each loan check. In all cases, the cars and accompanying VINs were fictitious and the banks never received loan repayment or title to the cars.

An alert loan officer at Peoples Federal Savings and Loan foiled the scheme in August 1984. While processing a loan application over the phone, she noted that the voice of the applicant sounded similar to the voice of a previous applicant whose loan had been problematic. She notified her superior who in turn contacted the FBI. An FBI agent confronted Molnar, Kane and a man named Peter Perich, the would-be applicant, at the bank when the three arrived to pick up the loan check. The men were not arrested at that time, but discontinued making loan applications.

On February 23, 1990, a grand jury returned a six-count indictment against Kenneth Kane. Count I charged him with conspiracy to defraud federally insured banks and savings and loan associations in violation of 18 U.S.C. § 371. Counts II through VI charged Kane with taking bank funds with intent to steal them in violation of 18 U.S.C. § 2113(b) and 2 in connection with the five separate loan applications. Counts II, III and IV charged that Kane had taken $6,750, $7,500 and $10,500 respectively from Calumet National Bank in Dyer, Indiana. Count V charged Kane with taking $6,400 from Hoosier State Bank in Hammond, Indiana. Count VI charged Kane with taking $8,200 from American Savings and Loan Association, also in Hammond. The same acts charged in Counts II through VI were the overt acts alleged to be in furtherance of the conspiracy charged in Count I.

After a two-day trial in July 1990, at which Molnar was the main prosecution witness, the jury convicted Kane on Counts I, IV, V and VI and acquitted him on Counts II and III. At sentencing, the district judge suspended the imposition of sentence and placed Kane on probation for a period of five years on each of the four counts on which he was convicted, with the sentences to run concurrently. Pursuant to the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663, 3664, the court also ordered Kane to make restitution in the sum of $24,750 to Calumet National Bank, $6,400 to Gainer Bank (successor to Hoosier Bank) and $8,200 to American Savings and Loan Association.

Kane challenges his conviction primarily on grounds of sufficiency of the evidence. He also complains that certain evidence was wrongly admitted at trial and that his trial counsel was ineffective. With respect to his sentence he argues that he cannot be ordered to make restitution of the amounts charged in the counts on which he was acquitted. We affirm the conviction and remand for resentencing.

## ANALYSIS

### A. Sufficiency of the Evidence

 Kane contends on appeal, as he did at trial, that he cannot be convicted on Count I for conspiracy because he never knew the illicit purpose of the conspiracy run by Molnar and Martin. He states correctly that a conspiracy conviction must be supported by substantial evidence that the alleged conspirator was aware of the essential nature and scope of the enterprise and intended to participate in it. *United States v. Muehlbauer,* 892 F.2d 664, 667 (7th Cir. 1990); *United States v. Durrive,* 902 F.2d 1221 (7th Cir.1990). Kane argues in addition that the convictions on Counts IV, V and VI for bank theft were improper because 18 U.S.C. § 2113(b) likewise requires knowing conduct. See *United States v. Harrod,* 856 F.2d 996, 1001 (7th Cir.1988).

Kane admits that he answered inquiries from banks, supplied VINs and falsely represented to banks that he had title to cars, but he claims that in doing so he was helping Molnar sell repossessed cars, not defrauding banks in the manner described in the indictment. According to Kane, Molnar occasionally sold repossessed cars, but because he had no auto dealer's license, he could not obtain car loans on behalf of his buyers. Kane testified Molnar supplied him with VINs and auto descriptions after Kane agreed to pose as the seller of the repossessed cars in Molnar's stead for the purpose of applying for car loans. Molnar assertedly was simply "borrowing" Kane's dealer's license in order to apply for loan money on behalf of his buyers. Kane stated that he obtained the loan funds and turned them over to Molnar in the belief that the funds would be applied legitimately to the retail prices of repossessed cars. Kane also testified that the $500 fee he received for each loan was his reward for performing this small favor.

 The evidence, when viewed in the light most favorable to the government, see *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990), supports the jury's rejection of Kane's exculpatory explanation and its conclusion that Kane was aware that the scheme's purpose was to defraud banks of loan funds. Either direct or circumstantial evidence can show a defendant's knowledge of a conspiracy's aims. *United States v. Vega,* 860 F.2d 779, 792 (7th Cir.1988). Here the evidence of Kane's knowledge was circumstantial, but reasonable inferences drawn therefrom support the guilty verdict.

 Kane was not a peripheral actor. He argues that he was an innocent pawn in the game masterminded by Molnar and Martin, but his level of involvement suggests otherwise. Kane admitted making applications for loans over the phone and answering phone inquiries from banks about vehicle descriptions and VINs. He provided at least one false bill of sale for a non-existent vehicle in connection with the loan made by Hoosier State Bank. When that bank was slow to issue its loan check, he called the bank manager and claimed he needed the check to meet his payroll. He joined Molnar and the impostor loan applicants when they picked up loan checks from the banks. He and his wife both cashed loan checks, thereby representing that Kane as the dealer had good title to the vehicles being sold.

Thus this is not a case in which the defendant played a significantly more menial role in the scheme than the admitted conspirators, suggesting that the defendant had not been exposed to the conspirators' aims. See *United States v. Bailey,* 859 F.2d 1265, 1274–1275 (7th Cir.1988) (no intent to defraud proven on part of two businessmen recruited by real estate brokers to apply for fraudulent loan, where businessmen were outsiders lacking real estate expertise that would allow them to suspect an illegal transaction), certiorari denied *sub nom. Ticktin v. United States,* 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787; *United States v. Pearlstein,* 576 F.2d 531, 541 (3rd Cir.1978) (reversing mail fraud convictions of salesmen who used misleading sales literature developed by their superiors in absence of evidence that they had positions of authority in company). While there was no direct evidence that Kane was told of the illegal objectives of the scheme, his working relationship

with Molnar and Martin supports an inference of involvement and understanding. See *Pearlstein*, 576 F.2d at 542 (continuing professional relationship can be relevant to show defendant's awareness of principals' wrongful purpose); *United States v. Sergio*, 934 F.2d 875, 879 (7th Cir.1991) (continuous involvement with conspiracy belies defendant's assertion that he did not know of its purpose).

Moreover, Kane's version of events was discredited. He did not introduce any evidence which corroborated his story that he was helping Molnar sell repossessed cars. Molnar flatly denied that he ever asked to use Kane's license to sell repossessed cars (Tr. 335). Instead his testimony suggested that Kane was brought into the larger scheme to defraud banks of loan funds after being told of the contours of the scheme. For example, he noted that Martin contacted Kane with the names in which applications should be made (Tr. 337), thereby casting doubt on Kane's assertion that he had involved himself only with Molnar and only to obtain loans for legitimate buyers.

In the end the jury chose between Kane's recitation and Molnar's. Kane presented and pressed his explanation of his motives, but the jury credited Molnar's testimony. Credibility determinations are within the jury's special province, *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986), and its finding here will not be disturbed. The jury was entitled to find from the evidence that Kane joined the conspiracy described in the indictment and that he took funds from banks with the aim of stealing those funds.

B. Admissibility of Evidence Impeaching Joann Kane and Evidence of Defendant Kenneth Kane's Prior Conviction.

Kane raises two objections with respect to the evidence that was admitted against him at trial. First he complains that the government improperly called FBI agent Stephen Cutler to impeach the testimony of another of its own witnesses, Joann Kane, who is the defendant's wife. Second Kane argues that the district court erred in allowing the prosecution to impeach him with a prior state court conviction for check deception.

■ Neither of the objections now raised was voiced at trial, making analysis under the plain error standard appropriate. Lacking an objection, reversal is only proper if the district court made an error and that error constituted a "miscarriage of justice" such that Kane probably would have been acquitted but for the erroneously admitted evidence. *United States v. Carroll*, 871 F.2d 689, 692 (7th Cir.1989).

■ The testimony of Agent Cutler was properly admitted to impeach Joann Kane. Defendant Kane acknowledges that Fed. R.Evid. 607 allows any party to attack the credibility of a witness, including the party calling the witness. However, he claims that the prosecution called Joann Kane, knowing she would refuse to inculpate her husband, merely to gain an opportunity to introduce prior inconsistent statements which suggested his guilt. It is an abuse of Rule 607 for the prosecution to call a witness from which it expects no useful evidence:

just so it [can] introduce hearsay evidence against the defendant in the hope that the jury [will] miss the subtle distinction between impeachment and substantive evidence—or, if it [doesn't] miss it, [will] ignore it.

*United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir.1984). Impeachment of one's own witness cannot be permitted where employed as a mere subterfuge to present to the jury evidence not otherwise admissible. *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975).

■ Mrs. Kane testified in part that she became suspicious about the bank checks she and her husband were cashing in 1984 because she had met two of the purported car buyers and each had been unable to produce a driver's license as identification at the bank. When she told her husband of her suspicions he responded that he would "check into it" (Tr. 320). At trial she denied that he said anything more. The pros-

ecution then called Agent Cutler who testified that when he delivered a grand jury subpoena to Mrs. Kane, he spoke to Mrs. Kane, who told him that her husband had responded to her fears by telling her to "shut up" and that the checks were "money in their pockets and not to worry about it" (Tr. 323).

Mrs. Kane's testimony did give the prosecution an opportunity to introduce hearsay unfavorable to Kane, but neither Mrs. Kane nor Agent Cutler was improperly called. The test is whether the prosecution exhibited bad faith by calling a witness sure to be unhelpful to its case. *Webster*, 734 F.2d at 1193. Here the prosecution had no reason to believe Mrs. Kane would be hostile or would supply an opportunity for impeachment. When the government offered her immunity, she claimed she did not need it and would testify for the prosecution even if not immunized (Tr. 192–193).[1] The prosecution also had a sincere reason to call Mrs. Kane to testify because she had first-hand knowledge of the scheme. She had cashed two checks and had met Molnar to deliver loan proceeds to him. After calling Mrs. Kane, the prosecutor did in fact elicit this testimony from her. It was only at the end of her direct examination that she testified inconsistently with her previous statement in one respect. The prosecution then impeached this portion of her testimony with Agent Cutler's testimony. The impeachment was permissible. When a government witness provides evidence both helpful and harmful to the prosecution, the government should not be forced to choose between the Scylla of foregoing impeachment and the Charybdis of not calling the witness at all. *Id.*[2]

Kane also complains that the prosecution improperly used his prior state court conviction for check deception to impeach his credibility. Kane testified on redirect examination that he was innocent of the misdemeanor but pled guilty to avoid having to go to court. On recross of Kane, the prosecutor asserted that Kane "lied to Judge Schiralli" if he had entered a guilty plea while innocent and asked Kane if it was "a common practice for you to lie" (Tr. 443). The prosecutor also referred to Kane's "lie" during his closing argument, saying that Kane had a "track record of lying" (Tr. 463). Kane complains first about the introduction of his conviction and additionally about the prosecutor's characterization of his guilty plea as a lie.

The introduction of the fact of the conviction is unproblematic. Fed. R.Evid. 609(a)(2) allows the introduction of a prior conviction if the crime is one involving dishonesty. Kane was convicted of a "deliver[ing] a check, * * * knowing that it will not be paid or honored." Ind.Code § 35–43–5–5. This is a crime of dishonesty. *Winegar v. State*, 455 N.E.2d 398, 402 (Ind. App.1983). Under Rule 609 a conviction following a plea is equally admissible as a conviction resulting from a trial. *United States v. Pardo*, 636 F.2d 535, 540 n. 32 (D.C.Cir.1980). Also the fact that Kane believed himself innocent at the time he decided to plead guilty does not affect the admissibility of the conviction to which he submitted. *United States v. Lipscomb*, 702 F.2d 1049 (D.C.Cir.1983).

---

**1.** Joann Kane was granted immunity prior to testifying.

**2.** The district judge made two errors in connection with Agent Cutler's testimony, though the impeachment itself was not objectionable.

First, Agent Cutler's written report of his interview of Mrs. Kane was improperly admitted into evidence. See Fed.R.Evid. 803(8)(B) (excepting law enforcement reports from hearsay exceptions). Because the one-page report only reiterated Agent Cutler's testimony, however, its admission was harmless.

Also, the district judge never gave an instruction admonishing the jurors to consider Agent Cutler's testimony only for impeachment purposes and not for the truth of the matter asserted. Again, the error did not result in a conviction that is a miscarriage of justice. Even if the jurors took as truth the statement supposedly made by Kane that the funds were "money in the pockets" of Kane and his wife, the statement did not prejudice Kane's defense. Kane's utterance could as easily be understood to support his version of events as the prosecution's. Though the statement certainly could be taken as evidence that Kane knew of the illegality of a fraudulent loan scheme, it also buttresses Kane's story that he was receiving small "kickbacks" (Def.Br. 29) for allowing Molnar to use his license to sell repossessed cars.

Although the conviction resulting from Kane's plea was admissible, the prosecutor overstepped the bounds of propriety by calling Kane a "liar" for pleading guilty. A guilty plea can be entered by the defendant and accepted by the court for reasons other than the guilt of the accused. *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (the accused may voluntarily and knowingly consent to conviction and sentence even if unwilling to admit his or her participation in crime). A defendant who believes himself or herself innocent of a charge yet concludes that his or her interests are best served by entering a guilty plea can do so. This being the case, the prosecutor had no basis for accusing Kane of lying when Kane claimed that he pled guilty simply to put an end to the state court prosecution and not because he believed himself guilty.[3] Kane was simply exercising his prerogative. Moreover, the prosecutor's remarks were not merely an attack on Kane's truthfulness. By adverting to a "track record of lying" and stating that Kane "lied to the banks on each of these checks" (Tr. 464) the prosecutor implied that Kane's behavior with respect to the loan applications was consistent with his bad character as exhibited on prior occasions. Evidence of prior convictions cannot be used for a purpose other than attacking credibility. See Fed.R.Evid. 609.

On balance, however, the prosecutor's unfortunate comments do not warrant reversal. Kane had ample opportunity on redirect examination to explain why he thought he was innocent of the charge of check deception and still believed it in his best interests to plead guilty. He recount-

ed that he had received a check from W & M Trucking Company for $2,400 which had been returned for lack of sufficient funds and that his checks in turn had bounced. Kane testified that he was pursuing a collection action against the trucking company. Kane stated that he pled guilty to the check deception charge to "get it over with" after travelling to court in Crown Point, Indiana, several times and concluding that he could not afford to lose more time at work.

In sum, Kane was able to present reasons for his plea with which the jury could sympathize, thereby blunting the effect of the prosecutor's accusations. The jury heard that Kane's plea was not motivated by an evil impulse to lie but by an ordinary desire not to attend further court proceedings. The weight of the evidence tending to prove Kane's involvement with the loan scheme also convinces us that no miscarriage of justice resulted from the prosecutor's statements regarding the check deception conviction. Kane's conviction will not be reversed.[4]

## C. Ineffectiveness of Counsel.

The supposed defects in the performance of Kane's trial counsel include his failure to object to inadmissible evidence, his failure to certify as a public record the complaint Kane had instituted against W & M Trucking, and his inadequate preparation of the defendant's character witness, Richard Ernest. To prevail on his claim, Kane must demonstrate both the deficiency of his counsel's performance and prejudice resulting therefrom. *Strick-*

---

3. The government argues that because the state of Indiana prohibits *Alford* pleas, Kane necessarily lied if he pled guilty while believing himself innocent. However, the relevant Indiana Supreme Court case, *Ross v. State*, 456 N.E.2d 420 (Ind.1983), only forbids a court from accepting a guilty plea if the defendant "both pleads guilty and maintains his innocence at the same time." *Id.* at 423. A court is free to accept a guilty plea so long as no simultaneous declaration of innocence is made. A defendant thus might, as Kane did, silently harbor a belief of innocence and the court can still validly accept the plea. The plea then is not a lie, but a

compromise settled upon voluntarily by the defendant. See *Alford*, 400 U.S. at 31, 91 S.Ct. at 164.

4. Kane also complains about remarks the prosecutor made during his closing argument about the brevity of the trial. He believes that these comments were meant to suggest that his was an "open and shut" case. Statements about the length of the trial, though, were made in the context of thanking the jury for paying close attention even for a brief period of time (Tr. 449–450). These remarks were not prejudicial.

# 1414

*land v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

The record does not support Kane's claim. As already explained, the evidentiary errors of which Kane complains did not prejudice him. Likewise, though Kane's counsel neglected to have Kane's complaint against W & M Trucking certified, with the result that it was not admitted into evidence, his inaction did not prejudice Kane. The admission of the complaint might have added credibility to Kane's testimony that he was in fact innocent of the check deception charge, but the matter was collateral and the effect of more evidence on the point would merely have been cumulative.

Finally the character witness called by Kane, auto dealer Richard Ernest, was not ill-prepared. Kane's attorney satisfactorily elicited the character testimony he desired. Then, with one question, the prosecutor during cross-examination elicited a tidbit of information which inculpated Kane. Ernest testified that the sale of a repossessed vehicle is complicated because the dealer never has possession of title (Tr. 388). Title remains with the bank that repossessed the car until after the car is sold. The prosecutor simply asked how Ernest would handle selling a repossessed car. Ernest replied that he would note on the bill of sale that he did not possess title so as to eliminate any chance of misleading a lending institution into thinking that the title was in the hands of the dealer (Tr. 389). Because Kane himself had prepared at least one bill of sale on which he had failed to make such a note in connection with one fraudulent loan, Ernest's testimony reflected badly on the defendant. Though Ernest's testimony was damaging, however, there is no indication that better preparation by Kane's attorney would have changed what transpired. The prosecutor asked an insightful question and was rewarded with favorable testimony.

D. Sentencing.

■ Kane was acquitted on Counts II and III which alleged his involvement in two fraudulent loan applications made for $6,750 and $7,500 respectively at Calumet National Bank. Kane contends that the district court improperly ordered restitution on these counts for which he was acquitted. Kane was sentenced not under the Sentencing Guidelines, but under prior law. The district judge ordered restitution under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, 3664, which authorizes the imposition of a restitution order in cases involving certain crimes "in addition to or in lieu of any other penalty authorized by law." 18 U.S.C. § 3663. Kane was ordered to pay restitution for all five fraudulent loan transactions charged in the indictment.

The government argues that because Kane was involved in a unitary scheme to defraud banks and was convicted of participating in a conspiracy, he can be ordered to pay restitution for the full amount of loss caused by the overall scheme, in spite of the fact that the jury acquitted him on two counts alleging bank thefts purported to be acts in furtherance of the conspiracy.

The government's argument assumes what it aims to prove, namely the overarching nature of the scheme. Kane was convicted of conspiracy, but the jury's verdicts, taken collectively, narrow the scope of the conspiracy in which Kane participated. Because the overt acts underlying the conspiracy were the same acts alleged in substantive Counts II through VI, the jury's acquittal on Counts II and III must be taken as a judgment that the conspiracy did not include the acts charged in those counts. See *United States v. Pollak,* 844 F.2d 145 (3rd Cir.1988) (jury's acquittal of defendant on some counts implies conspiracy offense not so pervasive as alleged, meaning that restitution ordered pursuant to Federal Probation Act, 18 U.S.C. § 3651 (repealed eff. Nov. 1, 1986), must exclude amounts set forth in counts for which appellant acquitted).[5] There is no inconsist-

5. The Federal Probation Act allowed district judges to order restitution as a condition of probation. 18 U.S.C. § 3651. The Probation Act was repealed by statute in 1984, see Act of

Oct. 12, 1984, Pub.L. 98–473, 98 Stat. 1987, with the repeal to be effective November 1, 1986, but continues to apply to offenses committed prior to November 1, 1987. See *United States v. Blue*

ency in the verdicts. The jury apparently found that a conspiracy existed, but believed it to consist of three fraudulent loan applications and not five.[6]

The government contends that a holding in Kane's favor will contradict numerous cases holding that a defendant can be ordered to pay restitution for acts not identified in the indictment, so long as the acts are part of the same course of conduct. See, *e.g., United States v. Davies*, 683 F.2d 1052, 1055 (7th Cir.1982) (construing Federal Probation Act to require restitution of any amount up to entire illicit gain from a scheme, even if only some specific incidents are basis of guilty plea), *United States v. Pomazi*, 851 F.2d 244, 250 (9th Cir.1988) (same result under VWPA); *United States v. Duncan*, 870 F.2d 1532, 1537 (10th Cir. 1989) (under VWPA restitution permitted for other criminal acts with significant connection to act for which conviction was had). The Supreme Court recently and unanimously has rejected this proposition. In *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408, the Court held that a defendant who had pled guilty to one count of unauthorized use of a credit card could not be made to pay restitution for losses resulting from defendant's unauthorized use of other credit cards. The Court held that the loss caused by the conduct identified in the count of conviction establishes the outer limits of a restitution order. *Id.*, 110 S.Ct. at 1982, 1984. If restitution cannot be ordered for uncharged conduct, it cannot be ordered for conduct with which the defendant is specifically charged and acquitted.[7] Kane must be resentenced and the amounts set forth in Counts II and III excluded from his restitution order.

## CONCLUSION

Kane's convictions are affirmed because the evidence was sufficient to support the jury verdict, the trial was untainted by reversible error, and Kane's counsel was not ineffective. Kane's sentence is vacated and the case remanded with instructions for resentencing.

*Mountain Bottling Co.*, 929 F.2d 526, 528 n. 3 (9th Cir.1991). The VWPA is available for offenses committed after January 1, 1983. Thus either the VWPA or the Probation Act can be applied to offenses occurring between January 1, 1983 and November 1, 1987, see *United States v. Mischler*, 787 F.2d 240, 245 (7th Cir.1986), but the VWPA has effectively supplanted the Probation Act for crimes committed after the latter date.

6. The government cites cases in its brief (Br. 30) approving broad restitution orders in conspiracy cases, the most relevant of which is *United States v. Anglian*, 784 F.2d 765 (6th Cir.1986) (restitution not limited to amounts charged in substantive counts and can equal damages inflicted by conspiracy as a whole), certiorari denied, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89. But it candidly admitted at oral argument that in none of those cases was defendant acquitted of committing some of the crimes alleged to be in furtherance of the conspiracy. They are therefore inapplicable.

7. The government also points out that traditionally a district judge imposing sentence may take account of conduct of which defendant was acquitted, if defendant is found to have engaged in that conduct by a preponderance of the evidence. See *United States v. Fonner*, 920 F.2d 1330, 1333 (7th Cir.1990) (Sentencing Guidelines case); *United States v. Haygood*, 502 F.2d 166, 171 & n. 16 (7th Cir.1974) (pre-guidelines case), certiorari denied, 419 U.S. 1114, 95 S.Ct. 791, 42 L.Ed.2d 812. It is true that ordinarily judges may use all the information they possess, including evidence of criminal conduct of which defendant was acquitted, to enhance a sentence. But restitution is a special case, for no court has approved a restitution order to a party named in a count on which the jury acquitted. The distinction is perhaps explained by the fact that the statutes authorizing restitution for crimes condition restitution upon conviction. See 18 U.S.C. § 3651 (authorizing restitution to "aggrieved parties for actual damages or loss caused by offense for which conviction was had"); 18 U.S.C. § 3663 (court can sentence defendant "convicted of an offense" to "make restitution to any victim of such offense").