In the

# United States Court of Appeals
### For the Seventh Circuit

No. 15-3671

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL "MICKEY" DAVIS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 138 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 27, 2016 — DECIDED DECEMBER 30, 2016

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In June 2012, defendant Michael
"Mickey" Davis made a $300,000 start-up loan to Ideal Mo-
tors, Inc., a car dealership in Melrose Park, Illinois, owned by
R.J. Serpico and his father Joseph Serpico. Within a matter of
months, Joseph had gambled the money away and Ideal Mo-
tors had fallen deep in arrears. The following summer, a man
named "Mickey" conspired to have R.J. Serpico's legs broken.
Though the scheme was never carried out, defendant Davis

was eventually convicted at trial of attempted extortion and using extortionate means to collect a loan.

Davis has appealed, raising five issues. The first is whether the district court erred by admitting against Davis the out-of-court statements by several people involved in the conspiracy to hurt Serpico. The second is whether the district court abused its discretion in allowing the prosecutors to impeach the testimony of a key prosecution witness with his prior inconsistent statements to government agents. Those two issues are substantial, but we find no reversible error. Davis raises three other issues concerning witness immunity, the scope of cross-examination, and the government's closing argument. Those issues also provide no grounds for setting aside the convictions. We affirm Davis's convictions and sentence.

I. *Co-Conspirator Statements*

A. *The Government's Case*

To set the stage for the legal issues, we first summarize the government's theory that Davis became angry with the Serpicos and turned to violent means to punish R.J. Serpico for the default on the outstanding debt. The scheme came to light when Paul Carparelli, a reputed Chicagoland mobster, contacted George Brown, his long-time associate. Brown was then cooperating with the FBI and recorded a number of relevant telephone calls. Carparelli told Brown that their mutual "friend … in Burr Ridge"—a restaurant owner named Gigi Rovito—had a "job" for them. During a series of conversations among Carparelli, Brown, and Gigi's brother John Rovito, the details of the job came into focus. The target: R.J. Serpico, the manager of a local Ford dealership. The mission: a "thorough" beating. The payout: "ten thousand clams."

And the client? The mysterious "Mickey," a "partner" of a man named Solly DeLaurentis.

The scheme was not just talk. On July 11, 2013, "Mickey" delivered a $5000 down-payment to Gigi Rovito, who forwarded the payment to Carparelli via John Rovito. On July 16, Carparelli told Brown that their client was "breathin' down my f***in' neck." Later that day, John Rovito told Brown that he would place an "anonymous phone call" to the Ford dealership to investigate R.J. Serpico's working hours. Rovito said that he would tell their client the job would be "handled" by the following weekend. On July 17, at the direction of the FBI, Brown told Carparelli that he had identified Serpico's home address. On July 21, in an effort to stall for time, Brown told Carparelli that two (fictitious) hit-men he had hired to attack Serpico had visited his home and spotted Serpico but had called off the attack after Serpico's wife and children appeared. Fortunately for Serpico, the scheme ended two days later when FBI agents arrested Carparelli and seized the $5000 down-payment from his residence.

The defendant in this case, Mickey Davis, was never recorded on any of the calls, but the government convinced a jury that Davis was the "Mickey" who had ordered the beating of R.J. Serpico and advanced the $5000 down-payment. The jury found Davis guilty of using extortionate means to collect a debt in violation of 18 U.S.C. § 894 and attempting to affect commerce by extortion in violation of 18 U.S.C. § 1951.

B. *The Co-Conspirator Statements*

To prove that Davis was the mysterious "Mickey," the government relied in large part on recorded conversations among

George Brown, John Rovito, and Paul Carparelli. These re-
cordings were admitted as co-conspirator statements under
Federal Rule of Evidence 801(d)(2)(E). Davis contends the dis-
trict court erred by admitting these statements because the
government failed to lay a sufficient foundation to support a
finding that Davis was a member of the conspiracy. We review
the district court's evidentiary rulings for abuse of discretion,
with any findings of fact reviewed for clear error. *United States
v. Pust*, 798 F.3d 597, 602 (7th Cir. 2015).

Under Rule 801(d)(2)(E), co-conspirator statements are ad-
missible against a defendant if the trial judge finds by a pre-
ponderance of the evidence that (1) a conspiracy existed, (2)
the defendant and the declarant were involved in the conspir-
acy, and (3) the statements were made during and in further-
ance of the conspiracy. E.g., *United States v. Haynie*, 179 F.3d
1048, 1050 (7th Cir. 1999), citing *United States v. Godinez*, 110
F.3d 448, 454 (7th Cir. 1997). Under long-settled circuit law, a
district court may admit co-conspirator statements condition-
ally based on the government's pretrial proffer, known in this
circuit as a "*Santiago* proffer." See *United States v. Santiago*, 582
F.2d 1128, 1130–31 (7th Cir. 1978), overruled in part on other
grounds by *Bourjaily v. United States*, 483 U.S. 171 (1987). "If at
the close of its case the prosecution has not met its burden to
show that the statements are admissible, the defendant can
move for a mistrial or to have the statements stricken."
*Haynie*, 179 F.3d at 1050.

In considering whether to admit alleged co-conspirator
statements conditionally, the district court may consider the
contents of the statements themselves. See *Bourjaily*, 483 U.S.
at 180. However, the record must also contain independent
evidence corroborating the existence of the conspiracy and

the participation of defendant and declarant. Standing alone, the statements themselves will not suffice. *United States v. Harris*, 585 F.3d 394, 399 (7th Cir. 2009).

The *Santiago* procedure requires the government to close the evidentiary loop at trial. The procedure assumes the government knows what its witnesses will say at trial. Cooperating witnesses, however, can be unpredictable. This case poses the problem of a *Santiago* proffer that the government could not satisfy completely.

In this case, the government's detailed *Santiago* proffer described the evidence it intended to introduce at trial to show that Davis conspired with the men whose telephone calls were recorded. The proffer highlighted the expected testimony from John Rovito, including the following:

- That Gigi Rovito asked John Rovito to recruit Carparelli to conduct the beating, and that John did so;

- That John Rovito observed Davis at Gigi Rovito's restaurant on the night of the downpayment; and

- That Carparelli told John Rovito that "the beating was in relation to a car dealership."

Rovito's trial testimony differed from the government's proffer in several respects. He testified, for instance, that he first learned about the beating conspiracy from either Carparelli or Brown and that he did not recall "having a conversation with Gigi about a beating or his friend Mickey about a beating." John Rovito acknowledged that Gigi had introduced him to a "Mickey" at one point, but he testified that he did not recall seeing "Mickey" at Gigi's restaurant the night he retrieved the

down-payment. John Rovito later repeated that he "recall[ed] meeting the gentleman one time," perhaps as early as two weeks before he retrieved the down-payment. Most significant, Rovito flatly denied any knowledge that the beating had anything to do with a car dealership, testifying variously that he did not know "what was going on, what it was for," that he had "no knowledge" of "Mickey's" and R.J. Serpico's involvement with a car dealership, that he did not "recall any dealership," and that he did not recall telling the FBI any differently.

When the government's evidence does not fulfill its *Santiago* proffer in key respects, the trial judge must take a fresh look at the admissibility of co-conspirator statements to decide whether the evidence actually offered at trial satisfies the government's burden under Rule 801(d)(2)(E). At various points during Davis's trial, in response to defense objections, the judge determined that the government had carried its burden. Those determinations were not an abuse of discretion. Even without John Rovito's testimony on those several points the government had expected from him, the government offered sufficient evidence to support the district court's finding that Rule 801(d)(2)(E) was satisfied so as to allow the co-conspirator evidence.

First, it is beyond dispute that *somebody* called "Mickey" wanted R.J. Serpico's legs broken and that a group had formed to carry out the attack. John Rovito and Paul Carparelli were unquestionably part of the conspiracy, and they implicated Gigi Rovito. George Brown acted the part, though as noted above he was an FBI cooperator. In a July 16, 2013 call, John Rovito told Brown that he expected to see their "friend"

shortly and that he would tell the friend the job would be han-
dled by the following weekend. At trial, John Rovito testified
that he had been referring in that conversation to "Gigi's
friend … Mickey."[1] John also testified that Gigi told him
"Mickey" was the person who wanted the beating. In another
call, Carparelli told Brown that the client was "Solly D's part-
ner. … Mickey, partner, Mickey, Solly DeLaurentis." Davis
himself acknowledged in a statement to the FBI that he fre-
quented Gigi's restaurant, that he knew both Rovitos, and that
DeLaurentis was his good friend.

The government also offered evidence of Davis's motive to
pursue the beating. Davis lost $200,000 on the Ideal Motors
loan, and he told the FBI himself that he was "extremely
pissed off." He demonstrated that anger on at least two occa-
sions. In January 2013, Davis confronted R.J. Serpico in his of-
fice at the Ideal Motors facility. As Serpico described it, Davis
had "what looked to be like a sheet of … gambling bets in his
hand and he put it down on [the] desk and leaned over and
sa[id] this wasn't the f***ing agreement." (Recall that Serpico's
father Joseph had gambled away the loan proceeds.) Davis
then asked a series of personal questions about Serpico's wife
and children. The questions showed that Davis knew a great
deal about Serpico's family and their activities and move-
ments that Serpico had never told him. For instance, Davis
asked whether the Serpicos still lived in Park Ridge; he also

---

[1] John Rovito's testimony on this point, like much of his testimony,
was equivocal. At first, he implausibly testified that the "friend" was Gigi
Rovito; he then said that he had been referring to "Gigi's friend …
Mickey." When the prosecutor pressed him to clarify whether the "friend"
he expected to see was in fact "Mickey," Rovito said: "It is possible, yes.
I'm not 100 percent sure."

asked about the ages of Serpico's children and whether his wife still owned a beauty salon in a particular suburb. Serpico testified that he had never told Davis where he lived, how old his children were, or where his wife's salon was located. Serpico perceived that he was "getting threatened," and that his "wife and … kids were getting threatened."

Later, after Serpico left Ideal Motors and alerted another creditor about vehicles that Davis had arranged to have towed to a different lot, Davis called Serpico and demanded an explanation. The conversation ended cryptically, with Davis saying: "If that's the way it is going to be, then, okay, fine, f*** it, that's the way it is going to be."[2]

Additional circumstantial evidence tied Davis to the conspiracy. Cell phone records indicate that he and Gigi Rovito were in frequent, increasing contact from January through July 2013, with 113 calls during that period and 47 in July alone. On July 2, 2013—the same day that Carparelli first contacted Brown about the "job"—Davis and Gigi had multiple phone conversations; John Rovito and Carparelli were in close contact that day as well. Historic cell site location data placed

---

[2] The government highlights a series of actions Davis took after the Serpicos fell behind on their payments. For example, Davis directed R.J. Serpico to fire his father Joseph; Davis had his assistant monitor the Ideal Motors bank statements and inventory; he required Ideal Motors to conduct business using a bank account that he jointly owned; and he seized a 1971 Chevrolet that R.J. Serpico had purchased and restored. The government characterizes these measures as escalating steps culminating in the extortion conspiracy. We express no specific view on the legality or contractual propriety of these actions, but we do not believe that Davis's exercise of rights as a secured creditor adds any weight to the government's case that he later engaged in the criminal conspiracy to beat R.J. Serpico.

Davis in the general vicinity of Gigi's restaurant on the evening of July 11, 2013, the night that Gigi delivered the down-payment to John Rovito. At 8:54 that evening and again at 9:19, Gigi spoke with Davis. At 9:27, John Rovito called Gigi. Minutes later, John called Carparelli—and at 9:50, while Davis was still within a couple of miles of Gigi's restaurant, Carparelli texted George Brown to tell him that "the package" had been delivered. These phone records were not conclusive by themselves, but they added weight to the government's theory.

Finally, although the government never asked John Rovito to identify Davis in court as the "Mickey" with whom he was familiar, Rovito did testify concerning "Mickey's" appearance, describing him as a "big guy … like a body builder," with "slick black hair" and a tan complexion. Davis, of course, was sitting in court, and the jury and the district judge had an opportunity to observe him and to compare his appearance with Rovito's description of the "Mickey" in the conspiracy. (Consistent with Rovito's testimony, the presentence investigation report described Davis as six feet tall and weighing 232 pounds.)

To be sure, none of the evidence we have just recounted proves definitively Davis's role in the beating conspiracy. But definitive proof or proof beyond a reasonable doubt is not the standard for admissibility under Rule 801(d)(2)(E), nor is the judge's consideration limited to the independent evidence of the conspiracy and the defendant's role in it. Rather, the district judge must be persuaded by a preponderance of the evidence that both the defendant and the declarant were involved in a conspiracy and that the out-of-court statements were made in furtherance of that conspiracy. *Bourjaily*, 483

U.S. at 176; *Haynie*, 179 F.3d at 1050. The government is entitled to have the judge consider the contents of the alleged co-conspirator statements in making the preliminary determination under Rule 801(d)(2)(E). *Bourjaily*, 483 U.S. at 181 (rejecting "bootstrapping" rule that would bar consideration of statements themselves in deciding their admissibility).

The government's case would have been stronger if John Rovito had testified in a manner entirely consistent with the government's pretrial *Santiago* proffer. Still, the evidence supporting admission of the co-conspirator statements was strong enough to survive Rovito's often evasive testimony. The circumstantial evidence was substantial—and the out-of-court co-conspirator statements themselves, coupled with that circumstantial evidence, provided a sufficient foundation from which the district judge could conclude that Davis was more likely than not a member of the conspiracy to beat R.J. Serpico. Those out-of-court statements, spanning 76 pages of telephone transcripts, cast light on the membership, scope, and objectives of the conspiracy. The conspirators spoke about their victim's identity, his home and workplace, and his schedule; about their client, "Mickey," the "partner" of Solly De-Laurentis; about the "thorough" beating that "Mickey" had ordered and the (fictitious) hit-men George Brown claimed to have hired; about the $10,000 fee and how it would be apportioned; and about the increasing urgency of the assignment and the potential consequences of failure.

Considering the independent evidence that the conspiracy existed and tending to show that Davis participated in it, as well as the out-of-court statements themselves, there was a sufficient basis to justify placing the out-of-court statements before the jury. The district judge did not err in admitting the

co-conspirators' statements into evidence under Rule 801(d)(2)(E).

II. *Impeachment of John Rovito*

Davis next argues that the district court erred in allowing the government to question John Rovito about his prior inconsistent statements to law enforcement and compounded its error by failing to issue a contemporaneous limiting instruction. We review these decisions for abuse of discretion. See *United States v. Spiller*, 261 F.3d 683, 689 (7th Cir. 2001).

John Rovito was, to put it mildly, a difficult witness for the government. During his two days of testimony, he answered the government's questions over one hundred times with some variation of "I don't recall," "I'm not 100 percent sure," or an ambivalent "it's possible." At certain points, his testimony departed materially from statements he had given earlier to FBI investigators. Three of these differences were discussed in Part I above in connection with the government's *Santiago* proffer (whether Gigi Rovito asked John Rovito to recruit Carparelli; whether John observed Davis at Gigi's restaurant the night of the down-payment; and whether John understood that the beating concerned a car dealership). Other inconsistencies emerged at trial. For example, Rovito denied using a special term to refer to broken legs when he had previously told the FBI that "the big guy" (the client) wanted "lowers." To impeach some of his testimony, the government questioned Rovito about some of his out-of-court statements, which were memorialized in FBI FD-302 reports. Davis objected to the use of those out-of-court statements at trial, and he maintains that objection on appeal.

Under Federal Rule of Evidence 607, any party—including the party that called a witness—may attack the witness's credibility. See *United States v. Bileck*, 776 F.2d 195, 198 (7th Cir. 1985) ("[T]he government had no choice in whom the defendant chose as his compatriots, and should not be required to vouch for their credibility."). We have long recognized, however, that it would be an abuse of Rule 607 for the prosecution to "call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or, if it didn't miss it, would ignore it." *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984); see also *United States v. Kane*, 944 F.2d 1406, 1411 (7th Cir. 1991) ("Impeachment of one's own witness cannot be permitted where employed as a mere subterfuge to present to the jury evidence not otherwise admissible."). The exception identified in *Webster* and *Kane* is a narrow one. The test is "whether the prosecution calls the witness in bad faith." *United States v. Burt*, 495 F.3d 733, 737 (7th Cir. 2007), citing *Kane*, 944 F.2d at 1412, and *Webster*, 734 F.2d at 1193.

In this case, before John Rovito took the stand, his own lawyer advised the court, the prosecution, and defense counsel that Rovito disagreed with some of the material in the FD-302 reports. According to his lawyer, Rovito feared a "perjury trap." Davis argues that the prosecution acted in bad faith in questioning Rovito on matters he discussed with the FBI despite knowing he would dispute the contents of the FD-302 reports. After Rovito's first day of testimony, however, the government told the district court that Rovito's lawyer had provided just one example of a statement with which Rovito disagreed. That statement concerned Paul Carparelli's alleged

drug dealing, a topic that was never broached at trial and that had nothing to do with Davis's case. The defense conceded that Carparelli's drug dealing was the only example the lawyer had provided, and the district judge rightly concluded that there was "no issue there." Moreover, Rovito had refused to meet with government counsel during the weeks leading up to trial. Although the prosecutors might have hoped and expected that he would testify consistently with his prior statements, they had no opportunity to review the proposed line of questioning with him or to address any concerns he might have raised.

Since the government did not know in advance the particular aspects of the FD-302s that John Rovito would disclaim, we find no evidence that the government acted in bad faith by calling him as a witness. Despite Rovito's evasiveness, he provided helpful testimony on several critical aspects of the government's case. For instance, he described retrieving an envelope from Gigi Rovito at the restaurant and then forwarding the envelope to Paul Carparelli, and he acknowledged that the envelope contained the $5000 down-payment for the beating. He described how the $10,000 total fee was to be allocated— $2000 each to himself, to George Brown, to Carparelli, and to any others involved in the conspiracy. He also corroborated Brown's testimony that the client was a man named "Mickey," an especially salient detail since so much of the evidence against Davis was circumstantial or indirect.

John Rovito was much less cooperative on other points. Perhaps most problematic for the government's case, Rovito insisted—even when confronted with his out-of-court statements to the contrary—that he was not aware that the beating conspiracy had anything to do with a car dealership. But even

if the prosecution had been on notice that Rovito might vacillate, it "cannot be that any time the government suspects that a witness will lie on some aspect of his testimony that it is barred from using the witness." *Burt*, 495 F.3d at 737. Rather, the government may elicit testimony from its witnesses in good faith and may use the impeachment tools that are available to any litigant if a witness becomes uncooperative. See *Kane*, 944 F.2d at 1412 ("When a government witness provides evidence both helpful and harmful to the prosecution, the government should not be forced to choose between the Scylla of [forgoing] impeachment and the Charybdis of not calling the witness at all.").[3]

As a fallback, Davis argues that if the judge did not err by allowing the government to question John Rovito about his out-of-court statements, then at the very least the judge should have given a contemporaneous limiting instruction telling the jury that it could not consider those statements as substantive evidence. If we had been presiding over the trial,

---

[3] Davis identifies one instance where the government's impeachment effort plainly *was* improper. In what the district judge treated as an unfortunate slip of the tongue, the prosecutor asked John Rovito whether he recalled telling the FBI about a conversation between "Davis" and Gigi Rovito. John Rovito never mentioned Davis's surname to the FBI. He testified that he learned the surname only when he was subpoenaed to appear in court. If the district judge had ignored this error, Davis's argument on appeal would have greater force. But the judge handled the mistake appropriately, instructing the jury to disregard both the question and any reference by the prosecutor to Davis's surname. The judge also reminded the jury that "lawyers' statements are not evidence." Given the judge's prompt response to the government's error, we do not think Davis was unduly prejudiced by the error.

we might well have agreed that a contemporaneous instruction would have been preferable, though the judge did properly advise the jury on the use of impeachment evidence during final instructions the next day. Our precedents make clear, however, that whether to give a contemporaneous limiting instruction is "committed to the discretion of the district court … and our review is deferential." *United States v. Van Waeyenberghe*, 481 F.3d 951, 956 (7th Cir. 2007) (citations and internal quotation marks omitted); see also *United States v. Oxford*, 735 F.2d 276, 280 (7th Cir. 1984) ("[T]he trial judge must determine on the facts of each case whether interim instructions are necessary … . Once the judge makes a determination regarding instructions, we will reverse that decision only on a showing of an abuse of discretion.").

In this case, in denying Davis's request for a contemporaneous limiting instruction, the judge explained that he preferred not to "bring to the attention of jurors as the fact finders" that he thought somebody was "lying or is inconsistent." While a contemporaneous instruction might have been helpful, we cannot say that the judge abused his discretion in declining to give one. He was, after all, in a "better position than we to determine whether a contemporaneous instruction would unduly emphasize the evidence in the minds of the jury," *United States v. Dabish*, 708 F.2d 240, 243 (6th Cir. 1983). The district court did not commit a reversible error by allowing the government to impeach John Rovito with his prior statements to the FBI and by deferring its limiting instruction until the close of trial.

III. *Additional Issues*

   A. *Use Immunity*

Davis makes three additional arguments on appeal. None has merit. Davis first contends that his due process rights were violated when the government granted immunity to John Rovito but not to John's brother Gigi. After learning that Gigi Rovito had invoked his Fifth Amendment privilege, Davis filed a "Motion for Defense Immunity" asking the district court to grant use immunity to Gigi. In denying that motion, the district judge explained that the decision whether to grant immunity is one for the government, not the court.

The judge was right. Prosecutors have "significant discretion to decline immunity to a witness, especially when it is likely that the witness will perjure himself." *United States v. Lake*, 500 F.3d 629, 633 (7th Cir. 2007). That prosecutorial discretion is cabined only by the requirement that a prosecutor may not "immunize witnesses with the intention of distorting the fact-finding process." *United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005). Even in a case involving such distortion, a district court cannot simply order the government to immunize a defense witness. While the court could theoretically dismiss the indictment as a sanction, *id.*, Davis cites no case in which any court in this circuit has taken that drastic step. Cf. *United States v. Chapman*, 765 F.3d 720, 732 (7th Cir. 2014) ("As far as we can tell, this court has never found that the failure to grant immunity to a defense witness deprived the defendant of due process.").

We see no evidence that the government acted improperly here. During his FBI interviews on March 26 and May 6, 2014, Gigi Rovito denied any knowledge of the beating conspiracy,

and he specifically denied forwarding the down-payment from Davis to his brother John. Those denials are inconsistent with other evidence that the government acquired, including the extensive testimony by George Brown and John Rovito and the inculpatory cell phone records. The government reasonably presumed that if Gigi took the stand, he would likely perjure himself. The government acted well within its discretion in declining an immunity deal that would have only facilitated such perjury. See *United States v. Wright*, 634 F.3d 917, 921 (7th Cir. 2011) ("[A]voiding future violations of the law, such as potential perjury, is hardly an unjustifiable and illegitimate government objective.").[4]

---

[4] Davis argues in the alternative that the district court should have either admitted Gigi Rovito's FD-302 reports or given a missing witness instruction. But as substantive evidence, the FD-302s were plainly inadmissible hearsay. Whether to give a missing witness instruction rests within the sound discretion of the district court. "To 'establish entitlement to a missing witness instruction, a defendant must prove two things: first, that the absent witness was peculiarly within the government's power to produce; and second, that the testimony would have elucidated issues in the case and would not merely have been cumulative.'" *United States v. Foster*, 701 F.3d 1142, 1154 (7th Cir. 2012), quoting *United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005). We do not see how Gigi Rovito was "peculiarly within the government's power to produce" any more than any other witness who is closely connected to criminal activity and is therefore reluctant to testify. See *id.* at 1155 ("[T]he government's ability to grant immunity does not make a witness who invokes the Fifth Amendment privilege peculiarly available to the government[.]"). Given the strong likelihood that Gigi (if he had testified consistently with his statements to the FBI) would have perjured himself, we do not see how his presence would have "elucidated issues in the case."

B.  *Scope of Cross-Examination*

Davis next argues that the district court erred when it precluded him from cross-examining George Brown about his past extortion tactics. As with the other evidentiary issues in this appeal, we review the district court's ruling for abuse of discretion. *United States v. Williamson*, 202 F.3d 974, 977 (7th Cir. 2000).

The defense theory was that the planned beating of R.J. Serpico, discussed in such detail in the recorded phone calls, had nothing to do with debt collection. That theory would not only tend to refute elements of both counts of the superseding indictment but also remove Davis's apparent motive for participating in the conspiracy: anger about the money lost on the Ideal Motors loan. The defense wanted to question Brown about his past practices because, the defense said, Brown would testify that he typically "sent very specific messages to the victims to pay back the debt they owed," and that in several cases he had performed these extortions on commission. In this case, by contrast, the job paid a flat $10,000, and the only message the conspirators were asked to deliver was a puzzling invective: "This is what you get for f***in' my sister."

The district court disallowed the proposed line of inquiry, noting that the details of Brown's prior extortions were collateral matters and that the defense theory was merely speculative. On appeal, Davis argues that the excluded evidence was "vital to the defense theory of its case." We disagree. While the excluded evidence might have bolstered Davis's position, the evidence was not so critical that it was an abuse of discretion to exclude it. The defense asked Brown whether he knew the purpose behind the planned beating of R.J. Serpico:

>DEFENSE COUNSEL: [Y]ou certainly weren't going to collect money from this man, correct?
>
>BROWN: As per my instruction from Paul [Carparelli], no, sir.
>
>DEFENSE COUNSEL: Right. You were just— this was just going to be a beating, correct?
>
>BROWN: That's correct, sir.

Brown's admission that the conspiracy, as he understood it, had nothing to do with debt collection provided *direct* support for the defense theory that the excluded evidence might have supported at best *indirectly*. Under these circumstances, the district judge did not abuse his discretion by limiting the scope of cross-examination.

C.   *Government's Rebuttal Argument*

Finally, Davis contends that the government constructively amended the superseding indictment during its rebuttal argument by implying that the loan from Davis to Ideal Motors was an extortionate extension of credit in violation of 18 U.S.C. § 892. We review this question *de novo*. See *United States v. Pigee*, 197 F.3d 879, 885 (7th Cir. 1999).

Davis points to several statements by the government that he interprets as an attack on the loan agreement itself. Early in his rebuttal argument, the prosecutor commented on the "math" associated with the loan deal, observing that Davis anticipated over $430,000 in profit during the three-year loan period. Several minutes later, the prosecutor said, "Who loans a known gambler $300,000 and just steps away? Of course not. He was in this all the way." The prosecutor later said that the "man named Mickey loaned $300,000 to a known gambler"

and "expected to … double[] his money in three years." Davis contends that these statements amounted to an argument that the "loan agreement was, for all intents and purposes, a 'juice loan.'"

While it is possible for the government to broaden the bases for conviction impermissibly through its closing argument, see *United States v. Cusimano*, 148 F.3d 824, 829, 830 (7th Cir. 1998) (finding no constructive amendment of indictment), that did not happen here. The prosecutor's reference to the lucrative loan terms helped him illustrate why Davis was so angry with R.J. Serpico and why Davis might have resorted to such extraordinary and extortionate tactics as the planned attack to break Serpico's legs. Context makes this clear. During the initial portion of the closing argument, the government argued that the "evidence establishes beyond a reasonable doubt that the defendant Mickey Davis attempted to extort R.J. Serpico and Ideal Motors" and that Davis "used extortionate means to collect an extension of credit." Later, the government characterized the beating conspiracy as the last in a series of steps by Davis to collect from Serpico:

> In January, he's playing off … the fear of future violence. He threatened R.J. Serpico in that conversation. He played off that fear for months. And then when that stopped being productive … he decided to follow up on that threat. He decided to escalate it, he decided to get violent but it's just more of the same. It's more about collecting what he's owed.

The prosecutor echoed those remarks at the close of his rebuttal, saying: "We are a country of laws. We are not a country of

men who get to choose how they will collect their debts, what means they will use to intimidate, to threaten violence."

Even assuming for the sake of discussion that the prosecutor's rebuttal language could have created some ambiguity, the judge corrected matters at the time. Defense counsel objected to each of the statements Davis now complains about. In response, the judge reminded the jury that attorneys' statements are "not evidence" and that the jury would be "given a copy of the indictment and a copy of the Court's instructions as to the law." Then, during his final instructions to the jury, the district judge explained that Davis was charged in two counts, and he described the elements of each count. At no point did the judge suggest that the Ideal Motors loan was extortionate from the outset or, as Davis puts it now, a "juice loan." Viewing the government's closing arguments in their totality and in context, we find no indication of a constructive amendment to the indictment.

The judgment of the district court is AFFIRMED.