*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 23-CO-0355 & 23-CO-0356

DAVID ANDREW WILLIAMS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2010-CF3-005739 & 2011-CF3-016420)

(Hon. Andrea Hertzfeld, Motions Judge)

(Argued December 10, 2024     Decided October 23, 2025)

*Adrian E. Madsen* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb* and *Elizabeth H. Danello*, Assistant United States Attorneys, were on the brief, for appellee.

Before HOWARD and SHANKER, *Associate Judges*, and RUIZ, *Senior Judge*.

SHANKER, *Associate Judge*: In 2010, appellant David Andrew Williams was convicted, following a guilty plea, of armed robbery and attempted robbery in connection with his robbery of a market while armed with a BB gun designed to look like a Glock pistol. Mr. Williams, who was sixteen at the time of the offense, was

given a suspended sentence and placed on probation under the Youth Rehabilitation Act (YRA), D.C. Code § 24-901 *et seq*. In 2011, Mr. Williams was convicted, following a guilty plea, of robbery and unlawful possession of a firearm in connection with another armed robbery he committed while on probation when he was seventeen. He was sentenced, not under the YRA, to fifty-four months of imprisonment to be followed by three years of supervised release.

In 2022, after completing his sentence and supervised release for the 2011 convictions, Mr. Williams moved in both cases to set aside his convictions under the YRA. *See* D.C. Code § 24-906(e-1) (providing that, regardless of whether the individual was sentenced under the YRA, the trial court may, in its discretion, set aside a youth offender's conviction (after completion of the sentence and supervised release) based on consideration of the factors set forth in D.C. Code § 24-903(c)(2)). Concluding that several of the Section 24-903(c)(2) factors weighed against Mr. Williams, the trial court declined to set aside the convictions in both cases.

Mr. Williams appeals, arguing that the trial court erred in a number of respects. We agree and therefore vacate the court's order and remand for further consideration consistent with this opinion.

## I.     Background

## A.     Legal Background

The YRA applies to "youth offenders," meaning persons twenty-four years of age or younger at the time they committed a crime (other than certain crimes not at issue here).  D.C. Code § 24-901(6).[1]  The YRA provides sentencing alternatives for such individuals, including a suspended sentence and probation instead of confinement or a term of imprisonment lower than the applicable mandatory minimum sentence.  *Id.* § 24-903.  In addition, the YRA allows a court, in its discretion and upon the youth offender's motion, to set aside a conviction after completion of the sentence or probation (and supervised release or parole), regardless of whether the youth offender was sentenced under the YRA.  *Id.* § 24-906(e-1)(1).

A YRA set-aside removes the conviction from the offender's public record but does not alter the fact of conviction, and the conviction may be used for certain purposes.  *Id.* § 24-906(f); *see G.W. v. United States*, 323 A.3d 425, 431 (D.C. 2024) (explaining that a conviction that has been set aside "still has defined consequences and does not give the youth offender a clean slate" and noting that "a conviction that

---

[1] At the time of Mr. Williams's convictions, the YRA applied to individuals twenty-two years of age or younger.  D.C. Code § 24-901(6) (1996).

has been 'set aside' under the YRA may still form the basis for a sentencing enhancement following a second or subsequent offense or be used for impeachment if the YRA recipient testifies in their own defense or serves as a character witness for another" and that a "person who receives a set-aside conviction also may not seal the fact of their arrest under D.C. Code § 16-802(a), which allows record sealing only upon a demonstration of actual innocence"); *Hickerson v. United States*, 287 A.3d 237, 241-43 (D.C. 2023) (observing that a set-aside, unlike the reversal or vacatur of a conviction, does not alter the fact of conviction and holding that a conviction that has been set aside remains a registrable offense under the District of Columbia's Sex Offender Registration Act of 1999).

In determining whether to set aside a youth offender's conviction under the YRA, a trial court must consider the factors pertaining to an initial sentencing under the YRA, set forth in D.C. Code § 24-903(c)(2). D.C. Code § 24-906(e-1)(2). That section lists twelve factors that a court "shall" consider, plus a thirteenth "catch-all" factor. The factors are:

> (A) The youth offender's age at the time of the offense;
>
> (B) The nature of the offense, including the extent of the youth offender's role in the offense and whether and to what extent an adult was involved in the offense;
>
> (C) Whether the youth offender was previously sentenced under this subchapter;

(D) The youth offender's compliance with the rules of the facility to which the youth offender has been committed, and with supervision and pretrial release, if applicable;

(E) The youth offender's current participation in rehabilitative District programs;

(F) The youth offender's previous contacts with the juvenile and criminal justice systems;

(G) The youth offender's family and community circumstances at the time of the offense, including any history of abuse, trauma, or involvement in the child welfare system;

(H) The youth offender's ability to appreciate the risks and consequences of the youth offender's conduct;

(I) Any reports of physical, mental, or psychiatric examinations of the youth offender conducted by licensed health care professionals;

(J) The youth offender's use of controlled substances that are unlawful under District law;

(K) The youth offender's capacity for rehabilitation;

(L) Any oral or written statement provided pursuant to § 23-1904 or 18 U.S.C. § 3771 by a victim of the offense, or by a family member of the victim if the victim is deceased; and

(M) Any other information the court deems relevant to its decision.

D.C. Code § 24-903(c)(2).

In considering a youth offender's motion to set aside a conviction under the YRA, the court "shall . . . make a written statement on the record of the reasons for its determination." *Id.* § 24-903(e-1)(2).

## B.      Factual Background

In pleading guilty to the 2010 armed robbery, Mr. Williams agreed that he pointed what appeared to be a Glock pistol at an employee of a market in northeast Washington, D.C., and ordered the employee to turn over money from the cash register.  Police officers recognized Mr. Williams from surveillance video and arrested him the day after the robbery.  In searching Mr. Williams upon his arrest, officers found a BB gun designed as a precise replica of a Glock 17 pistol. Mr. Williams admitted to detectives that he committed the armed robbery as well as two other similar armed robberies around the same time using the BB gun. Mr. Williams, who was sixteen at the time, pled guilty to armed robbery and attempt to commit robbery and was sentenced under the YRA to forty-two months of imprisonment suspended in favor of five years of probation.

In 2011, while on probation, Mr. Williams, armed with a handgun, approached an individual on the street and demanded his belongings.  Mr. Williams took the individual's ring and cell phone.  Following a chase, police officers stopped Mr. Willams after the robbery and found him in possession of the ring, the cell

phone, and a revolver loaded with eight live rounds and one spent cartridge. Mr. Williams pled guilty to robbery and unlawful possession of a firearm. He was sentenced, not under the YRA, to fifty-four months of imprisonment to be followed by three years of supervised release.

In 2022, Mr. Williams moved to set aside his convictions in both cases. Mr. Williams argued, among other things, that (1) he was sixteen and seventeen at the time of the offenses, and therefore was more impulsive, less emotionally mature, and less cognizant of the consequences of his actions; (2) in the 2010 case, he used a BB gun and the offense was planned by a another minor, and in the 2011 case, no one was injured; (3) he completed his terms of probation and supervised release without revocation; (4) he had participated in several rehabilitative programs, contributed positively to his community, and had no further contact with the criminal justice system after his release; (5) his father suffered from alcoholism and he had had a difficult home environment; (6) his age at the time of the offenses established an inability to appreciate the risks and consequences of his actions, and such an inability must weigh in favor of a YRA set-aside; and (7) he had had difficulty securing employment due to his convictions.

In opposing the motions, the government argued, among other things, that (1) the offenses were crimes of violence and the 2011 offense involved an actual

firearm; (2) Mr. Williams committed the 2011 offense while on post-conviction supervision for the 2010 offense; (3) the presentence report in the 2011 case did not mention Mr. Williams's father's alcoholism and described a normal upbringing, and Mr. Williams had reported that he was raised in a stable and supportive household; (4) the fact that Mr. Williams committed the 2011 offense after being convicted and sentenced for the 2010 offense meant that "he did not learn from the consequences of his conduct" and "he did not appreciate the risks and consequences of his conduct"; and (5) Mr. Williams had a low capacity for rehabilitation because he did not learn from his 2010 convictions and because in 2020, when he was twenty-seven years old, the Superior Court issued a temporary protective order (TPO) against him in a separate domestic violence matter. In the petition and affidavit for a civil protection order that resulted in the issuance of the TPO, the petitioner, who had been in a relationship with Mr. Williams, alleged that he came to her house to pick up his belongings two hours later than the time they had scheduled and she "felt uncomfortable"; she called the police; the two "exchanged words"; Mr. Williams called her and "threatened" to have her arrested; she was arrested on a warrant; and when she returned home her tires had been slashed.

The trial court denied Mr. Williams's motions in a consolidated order. The court noted Mr. Williams's age at the time of the offenses and observed that he was therefore "eligible" for sentencing (and thus a set-aside) under factor (A). The court

stated that Mr. Williams's offenses were crimes of violence and that Mr. Williams committed a "strikingly similar" offense in 2011 after his 2010 convictions and despite having received "leniency" through both YRA sentencing for the 2010 offense and a lower sentence based on the role of the other youth in the offense. Thus, the court weighed the "violent nature of the offenses in both cases" against Mr. Williams under factor (B). Under factor (C), the court noted that Mr. Williams had not previously been sentenced under the YRA before the 2010 offense but had previously been sentenced under the YRA before the 2011 offense; it did not, however, say anything about which way this factor cut. Under factor (D), the court weighed against Mr. Williams the fact that he was on post-conviction supervision when he committed the 2011 offense.

Due to his "commendable" participation in rehabilitative programs and engagement in the community, the trial court weighed factor (E) in Mr. Williams's favor. The court stated that factor (F) weighed in Mr. Williams's favor as to the 2010 convictions because he had had no prior contacts with the criminal justice system, but the factor weighed "significantly against" him as to the 2011 convictions because he was "convicted of another robbery less than two years after being convicted for the same conduct while on supervised release."

Regarding factor (H), the court stated that the fact that Mr. Williams committed the 2011 offense while on supervised release for the 2010 convictions "seriously calls into question [his] ability to appreciate the risks of, or genuinely accept responsibility[ ] for[,] his conduct," and therefore the factor weighed against granting the motions. The trial court found that Mr. Williams's lack of any involvement with controlled substances weighed in his favor under factor (J). Finally, regarding Mr. Williams's capacity for rehabilitation under factor (K), the court noted that, on the one hand, Mr. Williams committed the 2011 offense "quickly after" his 2010 offense, but, on the other hand, he had "remained free of further convictions since 2011"; the court then found that the balance on this factor tipped against Mr. Williams because, in addition to his "history of repeated convictions," in 2020 the Superior Court had issued a TPO against him.[2]

Considering the factors overall, the trial court denied Mr. Williams's motions to set aside his convictions. These appeals followed.

## II. Analysis

Mr. Williams asserts that the trial court erred in denying his motions by (1) concluding that his age at the time of the offenses made him merely eligible for

---

[2] The trial court found that factors (G), (I), (L), and (M) were either neutral or not applicable.

a YRA set-aside rather than weighing his age in his favor under factor (A); (2) considering under factor (B) the fact that the court had departed downward in the 2010 sentencing based on the role of the other minor; (3) failing under factor (C) to weigh in his favor, with respect to the 2010 convictions, the fact that he had not previously been sentenced under the YRA; (4) misinterpreting factor (H)'s reference to the youth offender's "ability to appreciate the risks and consequences" of their conduct; and (5) considering the TPO issued against him under factor (K). Mr. Williams also asserts that the trial court's errors were not harmless.

For the reasons that follow, we agree that the trial court erred in applying factors (A), (C), and (H). And because we are unable to say with fair assurance that the judgment was not substantially swayed by the errors, we vacate the trial court's order and remand for reconsideration of Mr. Williams's motions.

### A.      Standard of Review

The YRA mandates set-aside in certain specified circumstances, D.C. Code § 24-906(a), (e), but in cases like Mr. Williams's that are before the court upon motion by the youth offender after their sentence has been served, it expressly accords the trial court discretion in determining whether to set aside a conviction, *id.* § 24-906(e-1)(1).

We generally review discretionary decisions for abuse of that discretion. *See Johnson v. United States*, 398 A.2d 354, 361-62 (D.C. 1979) (observing that the notion "that a determination committed to the trial court's discretion is freed from the restraints of fact and the reasoned dictates of law" is "untenable"). "In reviewing for abuse of discretion, we 'must determine whether the decision maker failed to consider a relevant factor, whether the decision maker relied upon an improper factor, and whether the reasons given reasonably support the conclusion.'" *Bishop v. United States*, 310 A.3d 629, 641 (D.C. 2024) (quoting *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019)). A court also "by definition abuses its discretion when it makes an error of law." *Id.* Misinterpretation of a statutory term is an error of law. *Oshinaike v. Oshinaike*, 140 A.3d 1206, 1208 (D.C. 2016) ("The proper interpretation of a statute is an issue of law . . . ."). We consider questions of statutory construction de novo. *Bishop*, 310 A.3d at 641.

The government appears to agree that a set-aside decision is reviewed for abuse of discretion, but it also asserts that that review is significantly curtailed under our decision in *Veney v. United States*, 681 A.2d 428 (D.C. 1996) (en banc). In *Veney*, a YRA sentencing case, we said that the YRA requires "no more" than that the trial court "was aware of [its] authority to order treatment of the defendant as a youth offender, considered that rehabilitative option, and consciously rejected it," *id.* at 429, and that a decision to deny a YRA sentence "is not subject to appellate

second-guessing," *id.* at 435. According to the government, *Veney* (by extension to YRA set-asides) means that where the trial court was aware of its authority to set aside a conviction and consciously rejected the option, the court's reasoning in denying a set-aside "is not fertile ground for appellate review."

We agree that a trial court's weighing and balancing of the Section 24-903(c)(2) factors leading to its discretionary decision whether to impose a YRA sentence or set aside a conviction are subject to deferential review. *See Long v. United States*, 312 A.3d 1247, 1271 (D.C. 2024) ("Generally, on review for abuse of discretion, an argument that the trial court should have given more weight to factors . . . is not a basis for reversal. So long as the evidence provides sufficient support for the trial court's order, we will not substitute our judgment for that of the judge who heard the evidence.") (citation modified). We do not agree, however, that a court's interpretation and application of the Section 24-903(c)(2) factors are beyond appellate review or subject to some heightened abuse-of-discretion standard.

*Veney* certainly does not stand for that proposition, as the YRA when we decided *Veney* looked quite different: it did not include a list of mandatory factors and instead provided that where a court "determines that the youth offender will derive benefit" from YRA sentencing, the court "shall" state on the record the reasons for its determination, D.C. Code § 24-803(c) (1996), and where a court finds

that the youth offender "will not derive benefit" from YRA sentencing, the court may sentence the offender under any other applicable penalty provision, with no mention of a statement of reasons, *id.* at § 24-803(d) (1996). The issue in *Veney* was how much a trial court must say when it finds "no benefit" from YRA sentencing and sentences an offender as an adult. 681 A.2d at 428, 433-34. Although Section 24-803(d) lacked any requirement of a statement of reasons on the record, we rejected the government's argument that "the record need not reflect any inquiry— even an implicit finding—by the trial judge regarding the potential benefit to the defendant of treatment under the Act." *Id.* at 433. We also, however, rejected the argument that the court "must make a formal finding which focuses on the probability of rehabilitative benefit to the defendant." *Id.* We chose a middle ground, noting that Section 24-803(d) "requires something, but not very much." *Id.* at 434.

It was in that statutory context that we held that "an adult sentence may be imposed if the record reflects that the judge was aware of the availability under the Act of youth offender treatment, that he considered that rehabilitative option, and that he rejected it." *Id.* Thus, the fact that the trial court did not use the words "no benefit" was not fatal, where the trial court "considered and rejected the rehabilitative option available under the Act." *Id.* at 435. And because the court engaged in a "thoughtful and conscientious discharge of [its] sentencing

responsibilities," *id.*, its discretionary determination "with respect to the weight to be accorded to rehabilitation, as against the need for incapacitation, deterrence, or punishment," *id.* at 434, was "not subject to appellate second-guessing," *id.* at 435.

As noted above, the YRA now requires the trial court to consider enumerated factors and to provide a statement of reasons whether it grants or denies sentencing or a set-aside under the YRA. D.C. Code § 24-903(c)(1), (d) (sentencing); *id.* § 24-906(e-1)(2) (set-asides). While, consistent with *Veney*, this court generally does not second-guess—meaning substitute its judgment for—a trial court's discretionary decision based on the weighing and balancing of factors, *see Long*, 312 A.3d at 1271; *Johnson*, 398 A.2d at 361-63, this court does review even those decisions committed to the trial court's discretion to determine "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion," *Johnson*, 398 A.2d at 365; *see Bishop*, 310 A.3d at 641 (stating that we review the denial of a motion under the Incarceration Reduction Amendment Act (IRAA), which includes factors similar to those in the YRA, for an abuse of discretion). We see no basis for a different standard of review for YRA decisions under Sections 24-903(c)(2) and -906(e-1).

As the government observes, in *Copeland v. United States*, 271 A.3d 213 (D.C. 2022), we affirmed under abuse-of-discretion review the trial court's denial of a YRA sentencing motion, observing that "the court's sentencing decision 'reflect[ed] a thoughtful and conscientious discharge of his sentencing responsibilities.'" *Id.* at 226 (quoting *Veney*, 681 A.2d at 435). We did not suggest, however, that our abuse-of-discretion review differed from standard abuse-of-discretion review, nor did we dispense with an assessment of the trial court's reasoning with respect to the two Section 24-903(c)(2) factors at issue. *See id.* Moreover, the applicable standard of review was not disputed in *Copeland* and we did not analyze the issue. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). "A point of law merely assumed in an opinion, not discussed, is not authoritative." *Id.* (quoting *In re Stegall*, 865 F.2d 140, 142 (7th Cir. 1989)). *Copeland*, therefore, does not constitute a holding that, in reviewing YRA decisions, we need only ensure that the trial court engaged in a thoughtful and conscientious discharge of its sentencing responsibilities.

Accordingly, we review the trial court's order under our standard abuse-of-discretion rubric.

## B. Discussion

We address each of Mr. Williams's contentions in turn.

### 1. Factor (A): the youth offender's age at the time of the offense

Factor (A) requires the trial court to consider the "youth offender's" age at the time of the offense. The court here noted Mr. Williams's ages at the time of both offenses and then observed that he was "eligible" for sentencing (and set-aside) under the YRA.

We agree with Mr. Williams that the trial court erred as a matter of law in its statutory construction by treating factor (A) as an eligibility criterion rather than a consideration to weigh in the sentencing/set-aside calculus. Reading the statute "as a whole, giving the statute's provisions, to the best of our ability, a sensible construction," *see Wonder Twins Holdings, LLC v. 450101 DC Hous. Tr.*, 326 A.3d 768, 776 (D.C. 2024) (citation modified), we see that factor (A) by its terms is limited to "youth offenders" eligible for YRA treatment, defined in Section 24-901(6) as "a person [twenty-four] years of age or younger at the time that the person committed a crime." The plain meaning of the text of factor (A), therefore, refers not to eligibility under the YRA but to consideration of "the" eligible youth offender's age at the time of the offense in determining whether to grant the

requested relief.  To conclude that the Council wanted courts simply to state on the record what would necessarily be true under the terms of the factor effectively renders null factor (A)'s express reference to the defined term "youth offender."  *See D.C. Dep't of Consumer & Regul. Affs. v. A & A Rest. Grp.*, 232 A.3d 149, 154 (D.C. 2020) ("A statute should not be construed in such a way as to render certain provisions superfluous or insignificant." (quoting *Tuten v. United States*, 440 A.2d 1008, 1010 (D.C. 1982))).

This reading of the statute's plain text is, moreover, "confirmed by its legislative history and evident legislative purpose." *Flowers v. District of Columbia*, __ A.3d __, No. 24-CT-0276, 2025 WL 2535688, at *5 (D.C. Sept. 4, 2025); *see In re Macklin*, 286 A.3d 547, 553 (D.C. 2022) (explaining that we consider "statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation" when interpreting a statute).  In amending the YRA in 2018 and adding the Section 24-903(c)(2) factors, the Committee on the Judiciary & Public Safety noted that "young adults have diminished capacity to evaluate risk and consequences for their actions," D.C. Council Comm. On the Judiciary and Public Safety, Rep. on B22-0451, the "Youth Rehabilitation Amendment Act of 2018," at 11 (May 4, 2018) (hereinafter "Committee Report"), and are "less mature than older adults, less future oriented, more susceptible to peer pressure[,] and greater risk takers, especially in the presence of peers," *id.* at 12 (internal quotation

marks omitted).  The Committee further noted that its amendments, "grounded in physiological and social science," would make "eligibility for the sentencing and set aside provisions dependent on the age of the young adult when they *committed the crime*, not when they were *convicted*."  *Id.* at 14 (emphases in original).

The "maturity gap" discussed in the legislative history is the crux of the YRA; the statute is premised on the legislative judgment that youthful offenders lack the reasoning and maturity to make wise decisions, and that that diminished capacity gradually decreases (that is, reasoning and maturity increase) as one reaches their mid-twenties.  Committee Report at 12-13.  Accordingly, the inclusion of age as a factor (in addition to an eligibility criterion) reflects the Council's judgment that the court must weigh the offender's development and maturity by focusing on the person's age at the time of the offense.

Because age under factor (A) is not simply about eligibility, a trial court can determine in its discretion how much weight to give this factor; it would be within the court's discretion, for example, to view a sixteen-year-old more leniently than a twenty-four-year-old.  We hold, however, that it would be a misapplication of the factor to weigh age *against* a youth offender, as anyone twenty-four years old or younger is entitled to the presumption of immaturity and diminished reasoning that undergirds the statute.  As a matter of statutory construction, it would be odd to deem

an individual eligible for YRA treatment based on their age but then to weigh their age negatively in conducting the Section 24-903(c)(2) analysis. And, again, this conclusion is buttressed by the legislative history, which makes clear that the options of alternative sentencing and set-aside were premised on scientific research showing that "persons cannot gauge risk, understand consequences fully, or delay gratification until well into their 20s." Committee Report at 13 (internal quotation marks omitted). Because, however, "they have great capacity—physiologically and emotionally—for change," *id.* at 11, sentencing alternatives and the possibility of a set-aside—which give youth offenders "an opportunity to return home sooner, access rehabilitative services[,] and not have the stigma of a criminal record"— "improve[ ] the chances that a young adult will grow and develop, and increase[ ] the chances that we can prevent that person from offending later in life," *id.* at 12 (internal quotation marks omitted). Age under Section 24-903(c)(2)(A), then, is a "one-way ratchet" in favor of all youth offenders, but the extent of the ratchet can vary depending on the age of the particular individual at the time they committed the offense.

Here, we express no view on the weight to give Mr. Williams's age at the time of the offenses, but the trial court's treatment of age as a binary consideration rather than a factor to weigh in his favor was error.

### 2. *Factor (B): the nature of the offense*

Factor (B) directs trial courts to consider "[t]he nature of the offense, including the extent of the youth offender's role in the offense and whether and to what extent an adult was involved in the offense." D.C. Code § 24-903(c)(2)(B). Under this factor, the trial court noted that Mr. Williams "was not the principal planner, but rather a participant who 'went along' with" the 2010 armed robbery and that at sentencing the court had therefore "mitigated" Mr. Williams's sentence; but, "[d]espite this leniency, [Mr. Williams] committed a strikingly similar offense less than two years later."

The trial court considered, as weighing against Mr. Williams, that the 2011 convictions involved an offense similar to the 2010 offense, for which Mr. Williams had been afforded leniency. As to the 2010 convictions, it is not clear whether the court was suggesting that the "lenien[t]" sentence Mr. Williams received weighed against a set-aside. We need not decide, however, whether such considerations are permissible under factor (B). The court stated that "[t]he violent nature of the offenses in both cases weighs against granting" both motions. This appears to have been the primary basis for the court's weighing of factor (B) against Mr. Williams, and we see no abuse of discretion in that determination.

3. *Factor (C): whether the youth offender was previously sentenced under the YRA*

Under factor (C), the trial court simply noted that Mr. Williams had not previously been sentenced under the YRA before his 2010 convictions but had previously been sentenced under the YRA before his 2011 convictions, with no further discussion. Mr. Williams argues that the court abused its discretion with respect to the 2010 offense by failing to give any weight to the fact that before that offense he had not been sentenced under the YRA.

Factor (C) does not by its terms dictate how the fact that a youth offender previously received the benefit of a YRA sentence should weigh in the consideration of a subsequent request for YRA relief. Presumably, a court could reasonably (but need not) conclude that in the case of a recidivist offender, it should weigh against according that benefit again. The flip side of that coin is that a court could reasonably (but need not) weigh an offender's lack of previous YRA treatment in the offender's favor. And in the case of a person who has received YRA sentencing, a subsequent request for a YRA set-aside of the conviction might be bolstered by the previous determination to impose alternative sentencing under the YRA. There is no one manner to weigh this factor generally applicable to all situations; it must be fact-based. In light of our deferential review of the weight the court gives to particular factors, we are unlikely to second-guess a court's weighing of factor (C),

so long as the court grounds its determination on the facts of the case and the circumstances of the individual youth offender and provides a reasonable explanation that is sufficient to permit appellate review. *See Cruz v. United States*, 165 A.3d 290, 294 (D.C. 2017) ("[A]lthough we accord the trial court substantial latitude in its exercise of discretion, this latitude comes with conditions: that the court take no shortcuts, that it exercise its discretion with reference to all the necessary criteria, and that it explain its reasoning in sufficient detail to permit appellate review.") (citation modified).

Here, however, the trial court's order does not reflect any analysis of factor (C), and we are unable to determine whether the court exercised its discretion in one direction or the other, and why, or failed to exercise its discretion at all. Accordingly, the trial court abused its discretion in applying factor (C). *See Long*, 312 A.3d at 1269 ("A trial court's failure to explain . . . a nonobvious exercise of discretion generally requires a remand, particularly when it prevents adequate appellate review of the basis of its holding."); *Johnson*, 398 A.2d at 363 ("Failure to exercise choice in a situation calling for choice is an abuse of discretion.").

4.      *Factor (H): "ability to appreciate the risks and consequences of the youth offender's conduct"*

Section 24-903(c)(2)(H) instructs the trial court to consider "[t]he youth offender's ability to appreciate the risks and consequences" of their conduct. The

trial court stated that the fact that Mr. Williams committed the 2011 offense less than two years after and while on supervised release for the 2010 offense "seriously calls into question [his] ability to appreciate the risks of, or genuinely accept responsibility[ ] for[,] his conduct." It therefore weighed this factor against Mr. Williams.

We agree with Mr. Williams that the trial court misapplied factor (H). Based on its language, we read factor (H) as instructing trial courts to consider whether, at the time of the offense, the youth offender had the ability to appreciate the risks and consequences of the conduct they were engaging in or about to engage in. The Council's use of the words "ability," "appreciate," "risks," and "consequences" reveals a focus on the youth offender's capacity to perceive and comprehend the potential negative results of their actions. Factor (H) contains no reference to after-the-fact acceptance of responsibility or remorse. *See Flowers*, 2025 WL 2535688, at *4 ("When interpreting statutory text, our analysis starts with the plain language of the statute and assumes that the intent of the lawmakers is to be found in the language that they used.") (citation modified).

The legislative history underscores this conclusion. *See id.* ("We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent." (quoting *In re Macklin*, 286 A.3d at 553)); *Lopez-Ramirez v.*

*United States*, 171 A.3d 169, 172 (D.C. 2017) ("When interpreting a statute, the judicial task is to discern, and give effect to, the legislature's intent." (quoting *In re C.G.H.*, 75 A.3d 166, 171 (D.C. 2013))). As noted above with respect to factor (A), the YRA is premised on social science suggesting that "young adults have diminished capacity to evaluate risk and consequences for their actions," Committee Report at 11, and are "less mature than older adults, less future oriented, more susceptible to peer pressure[,] and greater risk takers, especially in the presence of peers," *id.* at 12 (internal quotation marks omitted). Notably, with respect to ability to appreciate consequences, the committee report contains no reference to an offender's acceptance of responsibility or remorse. *Cf. Holloway v. United States*, 951 A.2d 59, 65 (D.C. 2008) ("[I]t is the rehabilitative and public safety purpose of the YRA, like that of the [now-repealed Federal Youth Corrections Act], as well as the framework and legislative history of both acts, that persuade us to hold that it is the defendant's age at the time of conviction that determines eligibility for sentencing pursuant to the YRA.").

The trial court thus erred in interpreting factor (H) as involving consideration of the offender's acceptance of responsibility.[3] Further, the court erred in weighing

---

[3] We do not suggest that a trial court cannot consider an offender's failure to accept responsibility or lack of remorse in making a YRA determination. Those considerations could be relevant to the offender's "capacity for rehabilitation" under

what it deemed to be Mr. Williams's *inability* to appreciate the risks and consequences of his conduct *against* him. Reading factor (H) as we have set forth, based on both its text and the legislative intent, the provision makes sense only if a youth offender's lack of capacity to understand the possible negative outcomes of their behavior militates *in favor* of an alternative sentence or a set-aside. *See Long*, 312 A.3d at 1259 ("Statutory interpretation is a holistic endeavor, and, at a minimum, must account for the statute's full text and language as well as punctuation, structure, and subject matter.") (citation modified).

Accordingly, under factor (H), a trial court must assess the youth offender's capacity, at the time they committed the offense, to gauge and understand the

---

factor (K) or as "other information the court deems relevant to its decision" under factor (M), so long as they do not become a back door for an application we have concluded is impermissible under the factors listed in the statute or at odds with the YRA's scientific underpinning and purpose. Accordingly, we are not persuaded by the government's argument that Mr. Williams's reading of factor (H) leads to the "absurd outcome that youth offenders who 'appreciate[ ] the consequences' of their crimes, accept responsibility, and express remorse are less worthy of the YRA than those who do not and continue to blame victims." We doubt many would quarrel with the notion that a defendant's acceptance of responsibility, expression of remorse, and maturity *at the time of sentencing (or set-aside consideration)* should weigh favorably under the YRA. That, however, is simply not the concern of factor (H), which focuses on the offender's diminished capacity to appreciate risks and consequences *at the time of the offense*. Such diminished capacity, in the Council's judgment, reduces culpability and thus weighs in favor of alternative sentencing or set-aside of a conviction.

dangers and ramifications of their conduct, and it must weigh a lack of such capacity in the youth offender's favor under Section 24-903(c)(2).

We do not agree with Mr. Williams, however, that the *degree* to which a trial court weighs factor (H) in favor of a youth offender cannot vary. By its plain terms, factor (H) refers to a youth offender's "ability," which suggests a continuum. "One could posit, for example, that a twenty-three-year-old who acted with premeditation" had a greater ability to appreciate risks and consequences "than a sixteen-year-old who acted in the heat of the moment." *Id.* at 646. In *Bishop*, we acknowledged the validity of that hypothetical comparison, but nonetheless concluded that "the IRAA does not contemplate trial courts making case-by-case determinations of the degree to which the underlying offense was motivated by the 'hallmark features of youth,'" because such an inquiry would "run[ ] counter to the plain language of" IRAA factor ten. *Id.* Notably, however, IRAA factor ten uses different language from YRA factor (H): IRAA factor ten requires a court to consider, in relevant part, the basic fact of "[t]he diminished culpability of juveniles and persons under age [twenty-five], as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime." D.C. Code § 24-403.03(c)(10). *See Bishop*, 310 A.3d at 645 ("Factor ten takes as a given the

movant's diminished culpability and the existence of the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing movants to lengthy terms in prison, and simply requires the trial court to consider that fact in its overall assessment whether to grant relief.") (citation modified).

We find significant in this regard that IRAA factor ten (part of the original IRAA passed in 2016) predated the Council's addition of factor (H) to the YRA in 2018. The Council knew how to require trial courts to simply take as a given the fact of diminished capacity, and it instead chose to use language suggesting an assessment of the degree of ability (really, the degree of inability). *See 1618 Twenty-First St. Tenants' Ass'n, Inc. v. The Phillips Collection*, 829 A.2d 201, 206 (D.C. 2003) ("[I]f the Council had wanted 'bona fide' to have a special meaning or wanted specific factual criteria or factors to be considered in assessing objective good faith, it was well within its ability to do so, as it had done in other places in the Code."); *Riggs Nat'l Bank of Washington, D.C. v. District of Columbia*, 581 A.2d 1229, 1237 (D.C. 1990) ("[I]f the Council had meant what the [appellants] now say it meant, it surely could have said so."). In addition, the legislative history of the YRA recognizes that "the ability of a judge to use his or her discretion to consider the facts of the case and the young adult before them" is "[a]t the core of" the YRA.

Committee Report at 18. This suggests that the trial court can make a case-by-case evaluation of the YRA factors.

Nor do we think that factor (H) is, like factor (A), a "one-way ratchet" that *must* be weighed in the offender's favor. To be sure, in light of the legislative history's focus on the categorical nature of the maturity gap, in the mine run—if not the vast majority—of cases, youth offenders should be presumed to have had a diminished capacity to appreciate risks and consequences. But again, we find significant the Council's use of the word "ability" in factor (H) and the legislative history's reference to the trial court's "discretion to consider the facts of the case and the young adult before them." Committee Report at 18. It would likely be the rare case, but we decline to hold that a trial court would necessarily abuse its discretion in determining, with sufficient explanation, that the facts of the case and the particular circumstances of a youth offender overcome the presumption that the offender had a reduced ability to appreciate the risks and consequences of their conduct.

The government points to *Copeland*, where the trial court weighed factor (H) against the offender based on a lack of evidence of her "reflection on the 'risks and consequences' of her conduct" and her failure to express "remorse in either her YRA motion or at sentencing," and we found no abuse of discretion. 271 A.3d at 226.

The sole claims on appeal in *Copeland* regarding factor (H), however, were (1) that the trial court unlawfully considered the offender's decision to go to trial and testify that she had acted in self-defense as evidence of a lack of remorse and (2) that there was no support in the record for a finding that the offender lacked the ability to appreciate the risks and consequences of her conduct. We addressed only those evidentiary claims and had no occasion to opine on the proper interpretation of factor (H). *See id.* ("[O]ur review of the record confirms that appellant did not express remorse or an appreciation of the risks and consequences of her behavior either during her testimony or during the remarks she made at sentencing. We also see nothing in the record that indicates that the trial court relied on appellant's decision to go to trial and to testify in her own defense in evaluating factor (H)."). Again, "[t]he rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question." *Murphy*, 650 A.2d at 205. We thus do not see *Copeland* as authoritative on the interpretation of factor (H).

Here, the trial court did not conclude that Mr. Williams was able to appreciate the risks and consequences of his conduct; it found the opposite, but then weighed that against Mr. Williams, and it also referred to a failure to accept responsibility. This was a misapplication of factor (H).

### 5. *Factor (K): consideration of the TPO*

Factor (K) directs trial courts to consider the "youth offender's capacity for rehabilitation." D.C. Code § 24-903(c)(2)(K). The trial court here found circumstances cutting both in favor and against Mr. Williams under this factor but noted that in 2020, the Domestic Violence Division of the Superior Court issued a TPO against Mr. Williams. It then concluded that Mr. Williams's "history of repeated convictions, coupled with the recent TPO," warranted weighing the factor against Mr. Williams.

Mr. Williams does not argue that consideration of an *ex parte* TPO under factor (K) is necessarily error; he claims only that here, even accepting as true the facts alleged in the TPO petition, those facts do not indicate that he committed or threatened to commit a crime and they therefore could not provide a sufficient factual predicate for a determination that he lacked the capacity for rehabilitation.

It is true that there is no indication that the TPO was based on criminal activity by Mr. Williams. D.C. Code § 16-1004(d), however, provides that "[t]he court may issue a temporary protection order if the petitioner . . . establishes that the safety or welfare of the petitioner . . . is immediately endangered by the respondent." The court that issued the TPO, therefore, must have found after a hearing, *id.* § 16-1004(c), that Mr. Williams engaged in conduct that endangered someone's

safety or welfare. We think such a finding provides a sufficient factual predicate for a court to conclude that the offender has demonstrated behavior that the justice system deems concerning and that such behavior bears on the offender's rehabilitation. Without commenting on whether the issuance of a TPO by itself suggests a lower capacity for rehabilitation, we cannot say that the trial court exceeded its discretion in weighing factor (K) against Mr. Williams based on his "history of repeated convictions" *plus* the TPO.

6. *Harm*

In light of our conclusion that the trial court misapplied three of the Section 24-903(c)(2) factors, we cannot say with fair assurance that that the judgment was not substantially swayed by the errors, especially where the court determined that two other factors weighed in Mr. Williams's favor (and found four factors to be neutral or not applicable). *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *Fitzgerald v. United States*, 228 A.3d 429, 443 (D.C. 2020); *Smith v. United States*, 26 A.3d 248, 264 (D.C. 2011) ("The standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the jury's verdict.").

To be sure, the trial court placed heavy emphasis on the violent nature of both offenses and the fact that Mr. Williams committed the 2011 offense soon after and

while on probation for the 2010 offense. But it also noted Mr. Williams's "commendable" participation in rehabilitative programs and engagement in the community as well as his lack of criminal conduct since 2011. While we express no opinion on the appropriate set-aside determination on remand, the record does not eliminate our doubt whether the court might have reached a different decision had it properly understood factors (A), (C), and (H). *See Smallwood v. United States*, 312 A.3d 219, 227 (D.C. 2024) ("As this court has applied the *Kotteakos* standard, the central issue is whether the record eliminates the appellate court's doubt about whether the error influenced the jury's decision.") (citation modified).[4]

We also note that, while the court's consideration of the statutory factors, and Mr. Williams's motions, addressed the 2010 and 2011 convictions in a similar manner, there are differences between the two sets of convictions. For example, the 2011 convictions followed a prior offense and YRA treatment and Mr. Williams committed the offense alone, while the 2010 convictions represented Mr. Williams's first encounter with the criminal justice system and the trial court acknowledged that Mr. Williams was a "participant who 'went along' with the armed robbery." Ultimately, on this record, we cannot find harmlessness as to either set of

---

[4] The government does not argue that, assuming the trial court abused its discretion by misapplying certain factors, the errors did not substantially sway the judgment. Rather, it reiterates that *Veney* controls and asserts that, under *Veney*, even "suspect" reasoning by the trial court does not support reversal.

convictions.  The differences between the sets of convictions, moreover, counsel in favor of separate consideration of the two motions on remand.

### III.    Conclusion

For the foregoing reasons, we vacate the judgment of the trial court and remand for reconsideration of the motions for YRA set-asides.

*So ordered*.